Charles Urnest, Plaintiff-Appellant, v. The Forged Tooth Gear Company, a Corporation, The Cornell Forge Company, a Corporation, A. Nelson Cornell, Alverin M. Cornell and Arthur M. Cornell, Defendants-Appellees.

Gen. No. 52,250.

First District.

November 14, 1968.

James L. Perkins, of Chicago (Winston, Strawn, Smith & Patterson, of counsel), for appellant.

Thomas F. McWilliams and Howard J. DePree, of Chicago, for appellees.

MR. JUSTICE MORAN delivered the opinion of the court.

This is a so-called shareholders derivative suit brought by the plaintiff, Charles Urnest, as a minority shareholder of The Forged Tooth Gear Company, one of the defendants. The remaining defendants are The Cornell Forge Company, which is the principal shareholder of The Forged Tooth Gear Company, and three individuals, A. Nelson Cornell, Alverin M. Cornell and Arthur M. Cornell, who are the principal shareholders of The Cornell Company, as well as officers and directors of that company and the Forged Tooth Gear Company.

The alignment of the parties and the nature of the controversy can best be explained by a chronological account of the events which led to the lawsuit.

For some 35 years, The Cornell Company has been in the business of manufacturing and selling small steel drop forgings. It is an Illinois corporation, and has its office and factory in Chicago. In about 1938, The Cornell Company began to manufacture a new product, known as forged tooth gears. These gears were fabricated or forged at The Cornell Company, and then were sent to Western Metal Products Company for final machining and heat treating. Western Metal was another Illinois corpo-

ration controlled by the three individual defendants, who owned or controlled 49% of its stock. Cornell Company would pay Western Metals for its services, and this expense would be included by Cornell in the price it charged for its forged tooth gears.

In 1952, the individual defendants organized another Illinois corporation, known as The Forged Tooth Gear Company, hereinafter referred to as "FTG." The total initial capital of FTG was $1,000, divided into 1,000 shares, all owned by The Cornell Company. The corporation was entirely inactive until 1958, and it appears that the purpose for its organization by the individual defendants was to protect the corporate name in the hope that forged gears would eventually become a successful product. During this period of inactivity of FTG, the three individual defendants served as its officers and directors.

In about 1957, problems arose between the personnel of The Cornell Company and Western Metal Products Company, with resultant difficulties in the production of forged tooth gears. The individual defendants, as officers of The Cornell Company, felt that they needed to retain the services of a gear expert, and the plaintiff was recommended to them as a man who could probably help them solve their problems. The plaintiff had been involved for a number of years in all phases of the manufacture of gears, at several different plants. He had worked at one gear company for twelve years, starting as a machine operator, and finally becoming a production manager.

Plaintiff and the individual defendants had a number of discussions in the summer of 1957, with the result that plaintiff went to work for the Cornell Company in July of that year, on a temporary or trial basis, at a salary of $200 per week. His duties were to work out the technical problems at Western Metals Company, to assist in the design and production of gears, and to help in the promotion and sale of forged tooth gears by The Cornell Com-

pany. There was no written contract of employment, and no designated period of employment. The arrangement apparently worked out well, and plaintiff continued with The Cornell Company on this basis until April of 1958. During this period of time, however, plaintiff made it known that he was interested in acquiring some interest in the business which would give him an opportunity for capital gain, rather than ordinary income, and a consequent tax advantage. Finally, after a series of discussions with the individual defendants, it was agreed that the inactive corporation, FTG, would be activated for the purpose of giving the plaintiff this opportunity for capital gain as opposed to ordinary income. All parties agree that the only reason for activating FTG was to give plaintiff this opportunity for capital gain.

Following these discussions, in 1958, the articles of incorporation of FTG were amended so as to authorize the issuance of a total of 100,000 shares. On June 10, 1958, 19,000 shares of FTG were issued to The Cornell Company, so that Cornell then owned a total of 20,000 shares. An additional 10,000 shares were issued to the plaintiff. The purchase price was $1 per share, payable in cash.

In the activated FTG then, 29,000 additional shares of stock were issued, of which Cornell Company owned 20,000 shares, for which it paid $20,000 and the plaintiff owned the remaining 10,000 shares, for which he paid $10,000. On June 10, 1958, at a special meeting of the shareholders of FTG, plaintiff was elected a director to fill a vacancy left by the resignation of Arthur M. Cornell, and, on the same day, at a special meeting of the directors, plaintiff was elected president of FTG. It was further decided to pay plaintiff an annual salary of $13,000, together with a bonus.

Thereafter, the production and sale of forged tooth gears was conducted in substantially the same manner it had been before the activation of FTG. The Cornell Com-

pany still manufactured the initial forging, Western Metal Products still did the machining and heat treating, and The Cornell Company still did the selling. FTG had no role whatever in the process. However, Cornell Company paid FTG a portion of its receipts from the sale of forged tooth gears. There was no fixed percentage which went to FTG, and it appears that the amount was almost arbitrary. The price of the gear to the Cornell customer was determined by adding the basic cost incurred by Cornell, the payments made to Western Metals for machining and heat treating, and as much of a mark up for profit as the circumstances of the individual sale would allow. A portion of this mark up went to Cornell and a portion of it went to FTG. Prior to the activating of FTG, the FTG portion had simply been retained by Cornell as part of its own profit.

FTG had its own bank account, and it deposited therein all of the checks it received from Cornell Company. It was from this account that plaintiff's salary was paid. FTG had no equipment or machinery of any kind. Its only asset was cash in the bank. It did not have an office, but used space in the office of The Cornell Company, for which it reimbursed Cornell Company. FTG had no letterheads or stationery but used those of Cornell Company. It had no customers of its own, and no source of income other than its receipts from The Cornell Company. It had no telephone number, but used the telephone of Cornell Company. All billings were made by Cornell Company directly to the customer. The customer in turn sent back its check made payable to Cornell Company who in turn would divide the check between Western Metal, FTG and itself. The record bears out the finding of the Master that "all of its activities of every kind were conducted by and through Cornell Co."

There was never any written employment contract between plaintiff and the Cornell Company, nor between

182

plaintiff and FTG. There was no definite term fixed for his employment. Nor was there any written agreement between Cornell Company and FTG. There was no agreement of any kind whereby Cornell Company agreed to continue its relationship with FTG or to do business with FTG for any specific period of time. Neither was there any agreement as to how much Cornell Company should pay to FTG.

This arrangement continued until about March of 1959. Up to that time, the activated FTG had accumulated, by virtue of the payments from Cornell Company, $33,704.04, after payment of its expenses during that period. Thus, its net worth had increased from its original capital of $30,000 to a total of $63,704.04.

At the end of March, 1959, A. Nelson Cornell informed the plaintiff that the arrangement between Cornell Co. and FTG was to be discontinued, and plaintiff's employment was to be terminated. He offered to return to plaintiff his original $10,000, investment in FTG, plus an additional $1,000 or $2,000 "to compensate him for the use of his money." On April 17, 1959, a special meeting of the directors of FTG was held, at which a resolution was adopted removing plaintiff as president of FTG and designating A. Nelson Cornell to serve in his stead. Plaintiff voted against these resolutions.

The reason assigned by the individual defendants for plaintiff's discharge was that he was not getting along with the personnel at Western Metals. The record does not make clear whether there was merit to this charge, and the lower court took the view that the reason for plaintiff's discharge was immaterial.

After plaintiff's discharge as president of FTG, the gear business of Cornell Company continued as before, with the work formerly done by plaintiff being performed by A. Nelson Cornell. No one was hired by FTG to take plaintiff's place, and Cornell Company stopped making

payments to FTG. Plaintiff objected to his discharge, and to the termination of the payments by Cornell Company to FTG.

In May of 1959, at the annual meeting of shareholders, Alverin M. Cornell and A. Nelson Cornell were elected directors of FTG on votes cast by Cornell Co. A third director was elected by the vote of plaintiff. In April, 1960, at a meeting of the FTG directors, a resolution was adopted by a two-to-one vote that the corporation be dissolved. The two affirmative votes were cast by the Cornells.

In May of 1960, at a meeting of FTG shareholders, Cornell Company voted its 20,000 shares in favor of the resolution to dissolve the corporation. Plaintiff voted his 10,000 shares against the resolution.

In this suit, plaintiff seeks to enjoin the dissolution of the corporation, and also prays for an accounting of the monies which, on his theory of the case, Cornell Company should have been paying to FTG since the time it stopped making payments. The defendants filed a counterclaim praying for a judicial declaration that FTG may properly be dissolved.

The case was heard by a Master, whose findings were against the plaintiff, and these findings were approved by the trial court. The decree of the lower court provided that FTG could properly be dissolved, and denied the relief sought by the plaintiff. The decree further provided that the court would reserve jurisdiction to insure that the dissolution was carried out in accordance with law, and that plaintiff's rights as a minority shareholder were fully protected.

Plaintiff contends on this appeal that The Cornell Company, as majority shareholder of Forged Tooth Gear Company, owed a fiduciary obligation to Forged Tooth Gear and to the plaintiff, as its minority shareholder. Similarly, plaintiff argues that the individual Cornells, as

directors and officers of FTG, owed fiduciary obligations to FTG and to plaintiff as a minority shareholder. Plaintiff contends that Cornell Company and the individual Cornells breached these fiduciary obligations by terminating the relationship between Cornell Company and FTG and by voting to dissolve FTG. Plaintiff cites a number of authorities for the well-known propositions concerning the duties owed by officers, directors and majority shareholders.

The defendants take the position that, since there was no contractual commitment by the Cornell Company to do business with FTG at all, let alone for any particular period of time, it follows that The Cornell Company, and the individual Cornells, regardless of their positions in the corporate structure of FTG, had the right to terminate the relationship between the two corporations. Defendants' brief is unusual in that it cites not a single authority in support of their position. Defendants do assure us, however, that their position is "Hornbook Law."

■ There are certain practical difficulties which are inherent in plaintiff's prayer for an accounting. Since there was no contract requiring Cornell Company to pay any particular amount to FTG, and the amounts that were paid seemed to have been more or less arbitrarily arrived at, we see no basis upon which the amount of the supposed continuing obligation could be computed. Plaintiff suggests that the amount could be based upon the pattern established in the past, but this seems to us to beg the question. Similarly, we can think of no way to determine how long this supposed obligation of The Cornell Company would continue.

The Master's report concluded that,

> "Since F.T.G. had no legal or equitable right to continuation of the business relationship with Cornell Co., the fiduciary duty of the directors should not ex-

185

tend to attempting to perpetuate and keep the arrangement in force."

We are not so sure that the duty of the defendants was delineated entirely by what FTG had a contractual right to demand. The duty of officers, directors and majority shareholders can certainly go beyond the enforcement of the strict contractual rights of the corporate entity, and extend to the furtherance of the corporate interests generally. Accordingly, if the real controversy in this case were between the two corporate entities, the case would be a more difficult one than it actually turns out to be. However, we believe that the real controversy is not between the corporate entities at all, but is, rather, one between The Cornell Company on the one hand, and the plaintiff on the other, as indicated by the Master:

> "Furthermore, stripping the matter of all externalities and considering the fundamental aspects of the transaction, it seems clear that plaintiff was simply an employee of Cornell Co. and the loose business arrangement in conjunction with his ownership of stock in F. T. G. was merely a device for giving plaintiff an opportunity to obtain financial profit with a tax saving. Since defendants had complete right to terminate plaintiff's employment, which was at will, defendants should ipso facto be permitted to terminate the entire arrangement without liability of any kind."

We think this case is governed by the rule that, where the interests of creditors and third parties are not involved, the Court can disregard the corporate entity in order to adjudicate what is in reality only a dispute between the individual members. See Tilley v. Shippee, 12 Ill2d 616, 623, 147 NE2d 347 (1958):

> ". . . (T)he trial court, in the exercise of its equitable powers, can penetrate behind the screen of a

186

corporate entity or other forms of business in order
to apply the equitable maxim that equity will look
through the forms to the substance of a transaction
in order to ascertain the relationship of the parties."

See also Carrillo v. O'Hara, 400 Ill 518, 530, 81 NE2d
513 (1948); Chicago, M. & St. P. Ry. Co. v. Minneapolis
Civic & C. Ass'n, 247 US 490, 62 L Ed 1229, 38 S Ct 553,
557 (1917); Cleveland-Cliffs Iron Co. v. Arctic Iron Co.,
261 F 15, 17 (6th Cir 1919); Wise Realty Co. v. Stewart,
169 Cal 176, 185, 146 P 534, 538 (1915); Conway v. Citrus
Belt Land Co., 94 Cal App 533, 271 P 525, 527 (1928);
Kay v. Key West Development Co. (Fla), 72 So2d 786,
788 (1954); Siegel v. Ribak, 43 Misc2d 7, 249 NYS2d
903, 909 (1964); Modlin v. Licht, 224 App Div 614, 231
NYS 265, 266 (1928); 1 Fletcher, Cyclopedia of Corpora-
tions, § 46 (1963 Rev Vol).

In the instant case, the corporate entity known as FTG
has no real stake in the controversy. There are no credi-
tors and no third parties involved. The corporate form
was used by the plaintiff and The Cornell Company sim-
ply as a device to allow the plaintiff a kind of compensa-
tion which would be subject to a lesser Federal tax than
ordinary income. Under these circumstances, in the light
of the foregoing authorities, we believe it would be naive
to attempt a resolution of this case in terms of the rules
which ordinarily govern the relationships of officers, di-
rectors and majority shareholders to their corporations
and minority shareholders. Such considerations are sim-
ply not involved in this case.

██ In fact, then, plaintiff was working for The Cor-
nell Company both before and after the "activation" of
FTG. We believe the undisputed evidence makes it clear
that FTG was simply the alter ego of The Cornell Com-
pany, and, accordingly, the legal fiction of its distinct
corporate existence may be disregarded. See 18 CJS,
Corporations, § 7(e), p 382; 18 Am Jur2d, Corporations,

§ 17, p 565; 13 ILP, Corporations, §§ 3–4, pp 263–267; Dregne v. Five Cent Cab Co., 381 Ill 594, 602–603, 46 NE2d 386 (1943). The real parties in interest are The Cornell Company and the plaintiff, and the ultimate question is whether The Cornell Company had the right to terminate plaintiff's employment. On the undisputed facts, it clearly did. His employment was terminable at will, and it was not necessary that cause for his discharge be shown. We believe that the decree of the lower court is correct, and, accordingly, it will be affirmed.

Judgment affirmed.

ABRAHAMSON, P. J. and DAVIS, J., concur.