Leon COLEMAN and Thelma
Coleman, Appellees,

v.

Aaron TAUB, Gloria Taub, Taub Builders, Inc. and Taub Builders, Inc. Employees' Profit-Sharing Plan.

Appeal of Aaron TAUB, Gloria Taub and
Taub Builders, Inc.

No. 80–1599.

United States Court of Appeals,
Third Circuit.

Argued Oct. 16, 1980.

Decided Jan. 8, 1981.

Paul P. Welsh (argued), Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for appellants.

Alan L. Spielman (argued), Timothy A. Manzone, Alan L. Spielman, Ltd., Philadelphia, Pa., for appellees; Martin I. Lubaroff, Richards, Layton & Finger, Wilmington, Del., of counsel.

Before GIBBONS and ROSENN, Circuit Judges, and WEBER,* District Judge.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The sole question presented on this appeal is whether a "freeze-out" merger was impermissible under Delaware law. On cross motions for summary judgment, the district court found, in this diversity action, that no valid purpose existed for the merger. For this reason, the court concluded that the cashed-out minority shareholder was entitled to relief under Delaware law.[1] It thereupon entered summary judgment for the plaintiff and denied defendants' cross motion. 487 F.Supp. 118 (D.Del.1980). Due to the special contractual relationship between the parties in this case, we conclude that the merger was not necessarily improper. We therefore reverse and remand.

### I.

Plaintiff Leon Coleman was employed by defendant Taub Builders, Inc. ("Old Taub"). In connection with his employment, Coleman acquired 10 shares, or 1%, of Old Taub. The other 99% of Old Taub was owned by defendant Aaron Taub, who was also President of Old Taub. Coleman's employment contract with Old Taub provided that upon termination of Coleman's employment for any reason whatsoever, Old Taub would have the right to purchase all of Coleman's stock at a price to be agreed upon mutually, or in the alternative, by three impartial appraisers.[2]

---

* Honorable Gerald J. Weber, Chief United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Because the merger, and the fiduciary duty which was allegedly breached in carrying out the merger, involve the internal affairs of a Delaware corporation, the right to relief for this alleged breach is controlled by Delaware law. *See Beard v. Elster*, 39 Del.Ch. 153, 160 A.2d 731, 735 (1960); *cf.* Restatement (Second) of Conflict of Laws § 309 (1971).

2. The buy-back clause, contained in paragraph 11 of the contract, reads as follows:

11. Upon termination of Coleman's employment with Builder for any reason whatsoever, then Builder shall have the privilege of purchasing all of Coleman's stock in Builder on the terms hereinafter set out. Builder shall give to Coleman or to his personal representative notice of its intention to exercise this right of purchase by registered or certified mail at Coleman's last known address, within ninety days of the termination of Coleman's employment. The price to be paid by Builder for such shares shall be agreed upon between Builder and Coleman, or between Builder and Coleman's personal representative. If no agreed price can be reached by

By letter dated February 15, 1978, Old Taub terminated Coleman's employment and gave him "90 days notice of its intention to repurchase 10 shares of common stock in the corporation." The letter went on to say that "[w]e shall be happy to discuss the price of same with either you or your representative." Coleman did not respond. Instead, Coleman commenced on September 19, 1978, this diversity action in the United States District Court for the District of Delaware against Old Taub, Aaron Taub, and Gloria, his wife, the Secretary of Old Taub. Count I alleged wrongful termination of Coleman's employment. In Count V, Coleman brought a derivative action on behalf of Old Taub against directors Aaron and Gloria Taub. Coleman claimed that after his discharge, the Taubs wrongfully diminished the value of Coleman's shares by transferring Old Taub's major asset to themselves for inadequate consideration. In another count, Coleman had asserted that he was terminated for refusing to agree to this transfer.

Throughout this period, despite Old Taub's February 15th statement of intent, none of the parties pursued the contractually prescribed method for fixing a buy-back price for Coleman's shares. Instead, they occupied themselves with discovery in preparation for litigating the various substantive issues raised by Coleman's lawsuit. However, in April or May 1979, Taub set in motion, without Coleman's knowledge, steps that culminated on May 4, 1979, in a merger of Old Taub into a corporation ("New Taub") wholly owned by Aaron Taub. New Taub was created solely as a merger vehicle. The merger was carried out in compliance with the Delaware short-form merger statute, Del.Code tit. 8, § 253. Coleman's shares in Old Taub were cancelled, and he was tendered $1000, the price at which he purchased the shares in 1974.

When Coleman learned of the merger he supplemented his complaint by adding a Count X, alleging that "[t]he merger was not accomplished for a valid or corporate purpose. The sole purpose of the merger was to eliminate plaintiff as a shareholder of Old Taub, and to terminate plaintiff's derivative claim against Aaron and Gloria Taub." He requested that any further steps in the merger be enjoined, and that the court order rescission of the merger.

Meanwhile the defendants filed a motion to dismiss Count V, the derivative claim, on the ground that cancellation of Coleman's Old Taub shares deprived him of standing to sue the Taubs derivatively on Old Taub's behalf. The success of this claim was, however, tied to the validity of the merger. Thus, the defendants also moved for dismissal of Count X. The district court, treating the motion as one for summary judgment, refused to dismiss Count X. It held that the allegations of Count X stated a claim for breach of the fiduciary duty owed to a minority shareholder under Delaware law as stated in *Singer v. Magnavox Co.*, 380 A. 2d 969 (Del.1977) and *Roland International Corp. v. Najjar*, 407 A.2d 1032 (Del.1979). It also held that the buy-back clause, paragraph 11 of the Coleman-Old Taub agreement, did not operate as a waiver of Coleman's right to object to a merger allegedly constituting a breach of fiduciary obligations owed to Coleman.

The district court then turned to Coleman's motion for summary judgment on Count X. For purposes of this motion the court relied on defendants' counsel's statement to the court, on August 3, 1979, concerning the purposes of the merger.

This merger was done for the purposes of permitting the enterprise to continue in a corporate vehicle in which Mr. Coleman ... is not a stockholder ...; and for the purpose of thereby mooting the derivative claim asserted in this action, and thereby saving substantial legal costs to all concerned; and, for the purpose, as stated in the brief, of effectuating the contractual right to cash Mr. Coleman

the parties, then it is agreed that capital stock of Coleman shall be valued by three impartial appraisers, one to be selected by each of the said parties, and the two apprais-

ers so selected shall then select a third appraiser. The decision of the three appraisers shall be binding upon the parties hereto. . . .

out, which, under the agreement on which he sues here, we say that we had. Those were the purposes.

As this passage indicates, defendants put in issue the existence of two purposes other than simply ridding themselves of Coleman. The first alleged purpose was to moot the derivative litigation, avoid substantial legal costs, and relegate Coleman's claims therein to a statutory appraisal proceeding under Del.Code tit. 8, § 262. All parties agree on the existence of this purpose. Characterizing this as a case "where the majority shareholder has used his position to foreclose a claim raised against himself and other corporate officers by the minority shareholder," the district court rejected the validity of Taub's purpose to moot the derivative claim.

The other purpose was to effectuate the contractual right of the corporation to acquire Coleman's stock for cash. The parties disagree as to whether "cashing out" Coleman under paragraph 11, the buy-back agreement, was a purpose of the merger. Outside of paragraph 11 itself, defendants have introduced no affidavits, or material "as otherwise provided in" Rule 56, to defend this version of the facts. Defendants' counsel did, however, state to the district court that this was a purpose of the merger. He also points out on appeal that a brief submitted to the trial court by Coleman's counsel indicated that any request made by defendants to Coleman, asking that he proceed with a paragraph 11 cash-out, would have met with his refusal. However, defendants' counsel does not state that the district court would have refused to grant the defendants the relief to which they were entitled under paragraph 11.[3]

Coleman, the movant, produced little to refute the existence of defendants' second alleged purpose. Coleman did, however, assert by affidavit that, in the seven months between Old Taub's February 15th notice of intent to exercise its rights under paragraph 11 and Coleman's initiation of this lawsuit, defendants never initiated any steps to consummate the contemplated buyback.

On this record the district court found that the facts were clear—the merger had not been accomplished in order to "effectuate" paragraph 11, but rather, if anything, to avoid or violate it. It concluded that the one and only purpose of the merger was to eliminate Coleman. It resolved the remaining legal issue on the assumption that the holding of *Roland International Corp. v. Najjar* directly applied to this case. The district court thereupon entered summary judgment for the plaintiff.[4]

## II.

As noted above, the parties agree that one purpose of the merger was to moot the derivative litigation and relegate Coleman's claims therein to an appraisal proceeding under Del.Code tit. 8, § 262. The rights between the parties in this action, however, are fixed by contract. Were Coleman permitted to proceed in a derivative suit, the relief to which he might be entitled would be no greater than the relief he can ultimately hope to obtain under his contract. Therefore we cannot characterize this purpose as either proper or improper. It was simply unrelated to the legal realities governing this case. Of course, assuming that mooting the derivative claim could have crippled Coleman's ability to obtain relief to which he would have been otherwise entitled, it might well have been improper because of Taub's personal interest adverse to the corporation's alleged interest in the derivative suit. Under Delaware law, as well

---

**3.** In their brief to this court, defendants assert that following the district court's decision they made a formal written demand on Coleman "to proceed under paragraph 11" but received a negative response and have with the district court's permission amended their answer to assert a counterclaim for specific performance of defendants' right to "cash out" Coleman under paragraph 11.

**4.** Only Count X of Coleman's complaint was disposed of by the decision of the district court. The court did, however, rescind the merger and direct the reissuance of capital stock to Coleman. We thus take jurisdiction of this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

as the law of other jurisdictions, the "business judgment" of such an adversely interested director is checked by the power of the courts to review the charges and determine whether the complaining stockholders have a cause of action. *Maldonado v. Flynn*, 413 A.2d 1251, 1263 (Del.Ch.1980); *Cramer v. General Telephone & Electronics Corp.*, 582 F.2d 259, 274–75 (3d Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Clark v. Lomas & Nettleton Financial Corp.*, 625 F.2d 49, 52 (5th Cir. 1980). This result draws support from the language of Mr. Justice Brandeis:

> Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, *except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment* . . . .

*United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917) (emphasis supplied). *Accord, Galef v. Alexander*, 615 F.2d 51, 60–61 (2d Cir. 1980); *cf. Abbey v. Control Data Corp.*, 603 F.2d 724, 727 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed. 647 (1980). Thus we, like the district court, have doubts as to whether the purpose of mooting the derivative action was one that would have satisfied the fiduciary standards typically imposed by Delaware law. However, this reservation cannot form the basis for relief because merging could not have foreclosed any claim for relief to which Coleman was otherwise entitled under his contract.

The more important question here concerns the impact of the contractual buyback provision (paragraph 11) on the availability of the statutory "buy-back" mechanisms available to a Delaware corporation. Under the common-law rule, the merger of one corporation into another could be ob-structed by the vote of a single shareholder. *Reynolds Metals Co. v. Colonial Realty Corp.*, 41 Del.Ch. 183, 188–89, 190 A.2d 752, 755 (1963); *Colgate v. United States Leather Co.*, 75 N.J.Eq. 229, 72 A. 126, 129 (1909). To meet the growth of modern corporate life and the need to swiftly facilitate legitimate change in corporate operations and structure, many states, including Delaware, adopted statutes to facilitate mergers of corporations even in the face of the opposition of minority shareholders. *See, e. g.,* An Act Providing a General Corporation Law, ch. 273, § 54, 21 Del.Laws 445, 461–62 (1899). Construing such a statute in 1940, the Supreme Court of Delaware had this to say about the rights of dissenting shareholders:

> While their right to dissent is admitted, the public policy of the State declared by the statute, somewhat analogous to the right of eminent domain, does not permit a dissenting shareholder, as against an affirmative vote of two-thirds, to veto a merger agreement if its terms are fair and equitable in the circumstances of the case. Within the time and in the manner provided by the statute, the dissatisfied stockholder, if he so desires, may demand and receive the money value of his shares as that value has been agreed upon or has been determined by an impartial appraisement.

*Federal United Corp. v. Havender*, 24 Del.Ch. 318, 11 A.2d 331, 338–39 (1940). *Havender* dealt with a classic long-form merger statute, one that required prior notice to all shareholders followed by a meeting and a two-thirds majority vote of the stockholders in favor of the merger. However, under short-form merger statutes some of these procedures can be eschewed, provided that the merger joins a parent corporation with its 90%–owned subsidiary. The Delaware short-form merger statute, Del.Code tit. 8, § 253, permits such a subsidiary to be merged into its parent corporation by the mere unilateral act of the board of directors. By its very design, the short-form merger statute was intended to encourage and expedite corporate mergers.

In 1962, the Supreme Court of Delaware went so far as to state that "the very purpose of the statute is to provide the parent corporation with a means of eliminating the minority shareholder's interest in the enterprise. Thereafter the former stockholder has only a monetary claim." *Stauffer v. Standard Brands Inc.*, 41 Del.Ch. 7, 11, 187 A.2d 78, 80 (1962).

The apparent meaning of this language in *Stauffer* is no longer a reliable guide to the law of Delaware. In recent years, courts have been concerned with the potential for abuse when corporate mergers are used to force minority shareholders to accept cash or debt for their shares, thereby freezing them out of their equity position in the enterprise.[5] For example, such a merger can constitute the final step in the acquisition of the assets of one corporate entity by another. *See, e. g., David J. Greene & Co. v. Dunhill International, Inc.*, 249 A.2d 427 (Del.Ch.1968). The acquiring company, which stands on both sides of the transaction, "can dictate the terms of the merger agreement and force the minority to receive debt or cash consideration. As a result, the minority shareholders of the acquired company are frozen out of their equity interest, and the acquiring company achieves complete control of the acquired company's assets." Comment, *The Fiduciary Duty of Majority Shareholders in Freezeout Mergers: A Suggested Approach*, 47 Fordham L.Rev. 223, 223–24 (1979) (hereinafter *"Freezeout Mergers"*).

A freeze-out merger can also be used to reorganize the capital structure of a single business enterprise. *See, e. g., Hottenstein v. York Ice Machinery Corp.*, 136 F.2d 944 (3d Cir. 1943). As happened in the instant case, minority shareholders can be reorganized out of existence. *Cf. Bryan v. Brock*

& Blevins Co.*, 490 F.2d 563 (5th Cir.), *cert. denied*, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974). A shell corporation is created by the majority shareholders of an existing corporation, and, as the name implies, the shell has no assets, conducts no business, and initially its purpose is purely to serve as the merger vehicle. The control of both companies enables the majority shareholders to merge the original corporation with the shell company under terms that eliminate the minority shareholders of the original company and give them cash instead.

In *Singer v. Magnavox Co.*, 380 A.2d 969 (1977), the Supreme Court of Delaware had an opportunity once again to consider the recurring question of freeze-out mergers. In *Singer*, the complaint filed by minority shareholders of the Magnavox Company sought nullification of the long-form merger between Magnavox and a wholly-owned subsidiary of Magnavox's majority shareholder. The minority claimed that the merger was fraudulent because it served no valid business purpose other than the forced removal of the public minority shareholders from equity participation in Magnavox at a grossly inadequate price, thereby enabling Magnavox's controlling shareholder to attain sole ownership of Magnavox. The complaint also charged, *inter alia*, that the defendants breached the fiduciary duty that they owed to the minority shareholders by recommending approval of the merger at a cash price per share to the minority which they knew to be grossly inadequate. The court rejected the contention that statutory compliance insulated the merger from judicial review. In reversing the lower court's dismissal of the suit, the Court focused its decision on the fiduciary duty owed by majority stockholders for the benefit of the minority stockholders. It held that the ab-

---

**5.** However, in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1297, 51 L.Ed.2d 480 (1977), a case involving a short-form merger under Delaware law, the Supreme Court of the United States held that even if majority shareholders of a corporation had breached their fiduciary duty under state law to the minority shareholders, no relief was available to the minority in the federal courts under rule 10b·5. Despite allegations of a scheme to de-

fraud by gross undervaluation of the minority shares, the Court held that the minority stockholders would have to look to state law for relief. It concluded that a short-form merger under Delaware law did not involve deception or manipulation within the interdiction of rule 10b–5 merely because the minority shareholders had no advance notice of the merger and were cashed out without a valid business purpose.

sence of any business purpose other than the one alleged in the complaint would render the merger a breach of fiduciary duty. The question of which other purposes might save a merger from such condemnation was left to another day. 380 A.2d at 980 n.11. Citing its earlier decision in *Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107 (1952), it once again recognized as established Delaware law that "the dominant corporation, as a majority stockholder standing on both sides of a merger transaction, has 'the burden of establishing its entire fairness' to the minority stockholders . . . ." 380 A.2d at 976.

Less than a month after its decision in *Singer*, the Delaware Supreme Court confronted, in *Tanzer v. International General Industries, Inc.*, 379 A.2d 1121 (1977), the question it had reserved in *Singer*. The issue was whether a merger made primarily to advance the business purpose of the majority stockholders violated the fiduciary duty the latter owed the minority stockholders. The plaintiff minority stockholders sought to enjoin a shell type long-form merger because its sole purpose served the interest of the parent. The court stated that the question before it was whether the parent may cause a merger to be made solely for its own benefit, or whether that is a violation of fiduciary duty and actionable under Delaware law. It concluded that the majority stockholders had a right to look to their own corporate concerns in reaching a bona fide decision to merge subject, of course, to the duty it owed fellow stockholders. It held that a merger solely to facilitate long-term financing by the parent corporation was a proper exercise of voting power, subject to the "entire fairness" rule of *Sterling v. Mayflower Hotel Corp., supra*.

It made clear that the majority stockholder "need not sacrifice its own interest in dealing with a subsidiary; but that interest must not be suspect as a subterfuge, the real purpose of which is to rid itself of unwanted minority shareholders in the subsidiary." 379 A.2d at 1124.

In *Roland International Corp. v. Najjar*, 407 A.2d 1032 (1979), the Delaware Supreme Court considered whether the rule it had announced in *Singer v. Magnavox Co., supra*, applied to short-form mergers under the Delaware Corporation Law and concluded that it did.

The fiduciary duty is violated when those who control a corporation's voting machinery use that power to "cash out" minority stockholders, that is, to exclude them from continued participation in the corporate life, for no reason other than to eliminate them.

*Id.* at 1034 (footnote omitted).

*Roland* and *Singer* speak to the issue of how minority rights in corporate participation are affected by the existence of Delaware merger statutes. Apart from the monetary value that can be placed by a court on corporate stock, minority shareholders possess additional interests in their shares. The question of what form these additional interests will take has presented Delaware with a number of possible answers. *See generally* Borden, *Going Private—Old Tort, New Tort or No Tort?*, 49 N.Y.U.L.Rev. 987 (1974). At one end of the spectrum is the discredited notion that minority shareholders have a vested right in corporate participation.[6] Toward the other end of the spectrum is the position that the power to merge is the right to freeze out the minority leaving the latter with appraisal as their sole remedy.[7] An interme-

---

6. *See* Borden, *supra*, 49 N.Y.U.L.Rev. at 1020-21. *Cf. Keller v. Wilson*, 21 Del.Ch. 391, 190 A. 115, 125 (1936) (the right of a holder of cumulative preferred stock to unpaid accrued dividends is a vested right of property). This view shares the same conceptual origin, perhaps, as the equally obsolete common-law rule that gave each shareholder the power to veto a merger.

7. "[U]nder § 253, the 10% minority shareholder is entitled to fair value of his shares, and *not* to any opportunity to thwart the will of the overwhelming majority." *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283, 1306 (2d Cir. 1976) (Moore, J., dissenting), *rev'd on other grounds*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (footnote omitted) (emphasis in original). *Compare Stauffer v. Standard Brands Inc.*, 41 Del.Ch. 7, 11, 187 A.2d 78, 80 (1962) (the purpose of § 253 is to provide the

diate position allows the majority to relieve the minority of the right of participation, but only when it serves the corporate good; "somewhat analogous" is the right of the sovereign to take the property of individuals under principles of eminent domain. *See Singer v. Magnavox Co.*, 380 A.2d at 978 (quoting *Federal United Corp. v. Havender*, 24 Del.Ch. 318, 11 A.2d 331, 338 (1940)). This is the degree of "additional interest" that Delaware bestows upon minority shareholders: it consists in the right to remain a shareholder until elimination serves a valid, bona fide corporate objective. Although rejecting the contention that a stockholder's rights in stock are "exclusively the *value* of his investment, not its *form*," *Singer v. Magnavox Co.*, 380 A.2d at 977 (emphasis in original), the recent cases do not purport to eliminate the risk, exemplified in *Tanzer v. International General Industries, Inc.*, that a minority may be deprived of its shares by a vote of the majority.

Having adopted this intermediate position, and having recognized this degree of a stockholder's additional interest, the Delaware Court has told us in *Roland* and *Singer* that impairment of this interest is a violation of the majority's fiduciary duty to the minority. The impairments in those cases took the form of minority takeouts serving no legitimate purposes. To reach the conclusion that a fiduciary duty had been breached, however, the Court had to overcome a line of decisions suggesting that the Delaware merger statutes provided minority takeouts with a sort of statutory insulation. *See* 380 A.2d at 978 (citing, *inter alia, Stauffer v. Standard Brands Inc.*). The Court rejected such an inference by concentrating on a line of cases addressing the takeout question free from the constraint of this particular statutory argument. Delaware law has always held, ab-

sent statutory insulation, that a minority takeout constitutes a breach of the majority's fiduciary duty to the minority when the purpose of the takeout is simply ridding the corporation of the minority. *See Bennett v. Breuil Petroleum Corp.*, 34 Del.Ch. 6, 99 A.2d 236, 239 (1956); *cf. Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967) (condemning the issuance of shares for the purpose of retaining voting control). *See also Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del.Ch.1975); *Yasik v. Wachtel*, 25 Del.Ch. 247, 17 A.2d 309 (1941); *Allaun v. Consolidated Oil Co.*, 16 Del.Ch. 318, 147 A. 257, 260 (1929). *Roland* and *Singer* conclude that compliance with the letter of the Delaware merger statutes ought not to insulate the fiduciaries' acts from scrutiny as to the purpose of the freeze-out.[8] To do so would be to consign the minority to an appraisal proceeding for vindication of its entire right to corporate participation.

As we read the foregoing cases, they teach that in every merger under Delaware law, whether it be long-form or short-form, the essential consideration must be the fiduciary duty of fairness and good faith owed by the majority to the minority stockholders. This duty "arises not from the operation of [the merger statute] but independent of it." *Roland International Corp. v. Najjar*, 407 A.2d at 1036. As demonstrated by its reaffirmation of Chief Justice Layton's language in *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939), the Delaware Court continues to recognize that a careful analysis of the equities of each specific case is required because "no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale." *Singer v. Magnavox Co.*, 380 A.2d at 977.

It is apparent that a freeze-out that both complies with statutory proce-

---

parent corporation with a means of eliminating the minority shareholder's interest in the enterprise; thereafter the former stockholder has only a monetary claim) *with Roland International Corp. v. Najjar*, 407 A.2d at 1036 (while declining to read *Stauffer* as approving a merger accomplished solely to freeze out the minority without a valid business purpose, the *Singer* and *Roland* courts nonetheless recognized a

need to overrule any statement in *Stauffer* inconsistent with this interpretation).

8. "[I]nequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437, 439 (Del.1971), *quoted in Singer v. Magnavox Co.*, 380 A.2d at 979.

dures, and fails to breach a fiduciary duty, does not run afoul of Delaware law. We believe that a minority shareholder may bargain away the "additional interest" in corporate participation which might otherwise be the basis for a fiduciary duty on the part of the majority. Once such a bargaining away is established, Delaware law has nothing to tell us regarding the need for a valid business purpose in order to justify a merger, for it is only the "additional interest" that calls for an inquiry into business purpose. Moreover, "fiduciary duty" in this context is merely another label for the right to an inquiry into the purpose of the merger. Thus, if such an inquiry is inappropriate because the minority's "additional interest" has been bargained away, the merger cannot, in itself, constitute a breach of fiduciary duty. We find nothing to the contrary in either the recent Delaware cases, or the older cases explicating the bounds of fiduciary duty.

Delaware law does not go so far as to say that *contractual* language cannot insulate a freeze-out merger from attack. Particularly here, where all shares of the corporation are owned by only two shareholders and the public is not affected, there is no reason why an appeal to general fiduciary law should be used by either party as a pretext for evading his contractual obligations. *Cf. Clark v. Dodge*, 269 N.Y. 410, 199 N.E. 641 (1936) (upholding a contract to use stock control to continue another party as a director and general manager of a corporation); *Siegel v. 141 Bowery Corp.*, 80 Misc.2d 255, 362 N.Y.S.2d 897, 901 (1974), *aff'd* 51 A.D.2d 209, 380 N.Y.S.2d 232 (1976) (directing that issues raised in a dissolution proceeding be resolved, instead, in a contractually prescribed arbitration proceeding); *Lane v. Abel-Bey*, 70 A.D.2d 838, 418 N.Y.S.2d 25 (1979), *aff'd*, 50 N.Y.2d 864, 407 N.E.2d 1337, 430 N.Y.S.2d 41 (1980); *Siegel v. Ribak*, 43 Misc.2d 7, 249 N.Y.S.2d 903, 907–10 (1964) (relegating claims raised in a derivative suit to arbitration); *Urnest v. Forged Tooth Gear Co.*, 102 Ill.App.2d 178, 243 N.E.2d 596 (1968) (disregarding the legal fiction of distinct corporate existence, with attendant fiduciary relationships, in a minority shareholder's suit to enjoin dissolu-

tion of corporation). A leading commentary in the field makes a similar point:

> In close corporations, freezeouts generally arise in the context of a dispute over the disentanglement of what are essentially partnership arrangements among more or less active participants for whose securities there is no market. . . . There is, therefore, reason to facilitate or encourage the departure of one group or the other from the enterprise—both in terms of the personal well-being of the participants, and because of the impact of continuing disagreements on their conduct of the enterprise. . . . [U]nlike the investors in a public corporation, the parties in a close corporation can contract in advance about their arrangements; any skew in the corporate law that permits majority power to displace the minority can thus be offset by contract. Modern statutes purport to offer special solutions for the problem of disentangling the essentially personal relationships of parties in conflict in close corporations. . . . But it is hard to see any role for "business purpose" as a doctrine in filtering permissible from impermissible freezeouts in close corporations . . . .

Brudney & Chirelstein, *A Restatement of Corporate Freezeouts*, 87 Yale L.J. 1354, 1356–57 n.9 (1978). Moreover, since the question of whether or not such a bargaining away has occurred can be tested in a contract action, merger in such a case cannot have the disfavored effect of relegating the minority only to a statutory appraisal proceeding for a determination of its entire interest in corporate participation.

### III.

In the instant case, the scope of the fiduciary duty owed by the majority to Mr. Coleman depends critically upon an additional dimension, created by a buy-back clause which was not present in either *Singer, Roland,* or *Tanzer*. The buy-back clause provided that upon termination of Coleman's employment "for any reason whatsoever," Old Taub, upon giving written notice to Coleman within ninety days, had the specific right to repurchase Coleman's shares and thereby terminate his equity in-

terest in the company at a price to be mutually agreed upon or, in the alternative, a value to be determined by three impartial appraisers. Thus, when Coleman contracted to work for Old Taub and acquired a 1% interest in the corporation, he at the same time gave it the right to cash him out in the event his employment was terminated. The district court, however, applied the literal language of *Roland* and *Singer* without taking into account the impact of the particular relationship between Coleman and Old Taub on the fiduciary duty owed by Taub to Coleman.

In its decision, the district court virtually applied a per se rule in disposing of the motion for summary judgment holding that under the Delaware Supreme Court decisions "a merger cannot be accomplished for the sole purpose of eliminating minority stockholders." In so doing, it summarily disregarded Coleman's contractual commitment to Mr. Taub. This was not a contract to be found in the fine print of documents designed to govern rights between a publicly traded corporation and the passive investing public. Rather, the parties here carefully agreed to this language in the context of a close business relationship. The parties entered into that undisputed commitment at the time of Coleman's employment and prior to his acquisition of ten shares of stock in this small, close corporation consisting of only two stockholders. Coleman has not complained that paragraph 11 is invalid. Such repurchase options "have been recognized as serving a number of legitimate business purposes, including restrictive ownership of corporate stock and have been generally upheld by the courts." *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*

562 F.2d 1040, 1046 n.9 (8th Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).[9] The circumstances attending the sale of the stock and the unconditional requirement that Coleman commit himself to sell it back in the event of his termination of employment "for any reason whatsoever" leave little doubt that Old Taub intended to avoid under all circumstances the risk of disruption from a dissident, disaffected ex-employee. On the other hand, Coleman bargained for the right to be a shareholder only while he remained an employee. He did not bargain for the privilege of being a dissident, litigious, outside minority stockholder and the obvious purpose of the buy-back clause was undoubtedly to avoid such a situation. If that was not the obvious purpose of the restrictive clause, it is at least a fair and reasonable inference to which defendants were entitled on a summary judgment motion. Such a purpose is practical, not uncommon, and not improper.

Unlike the typical minority shareholder, whose right of continued participation in the corporate enterprise continues until he either sells his stock or is merged out for a valid business purpose, Coleman will have no right to continue to hold Old Taub shares beyond the time that a value is placed on those shares and the purchase price is tendered in accordance with the contract between Coleman and Old Taub.[10] Fulfillment of Coleman's ultimate obligation of relinquishment must be preceded, of course, by various actions on the part of each party. Because this appeal deals solely with the summary judgment awarded to Coleman, we need not resolve all of the contract issues arising from the existence of paragraph 11. It is sufficient for our purposes

**9.** Cf. *DeVries v. Westgren,* 119 Pitt.L.J. 61, 62 (Allegheny County, Pa.1970) (holding such an agreement legal and enforceable). *Compare St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d at 1053–54 (where employer's option to purchase employee's stock was triggered by an event wholly uncontrollable by the employee, it was enforceable) *with Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 538 F.2d 532 (3d Cir.), *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976) (noting that "arguments can be made" that a buy-back agreement "as exer-

cised in this [voluntary retirement] case," is invalid under state law).

**10.** Paragraph 8 of the contract also gave Coleman the privilege "at any time during the first twelve years of this Agreement" to purchase up to 250 Old Taub shares at $100 per share. Although Coleman argues that the merger deprived him of the value of this clause, we do not address the merits of his argument on this appeal. This issue, like the other contract issues in this case, remains to be decided by the district court on remand.

to note that the February 15 letter terminating Coleman's employment also communicated notice of defendants' "intention to repurchase" Coleman's shares. A mutually binding and enforceable bilateral contract for purchase and sale was at least arguably created by that notice. *See, e. g., Bonde v. Weber*, 6 Ill.2d 365, 128 N.E.2d 883, 888–89 (1955); *Turner v. Shirk*, 49 Ill.App.3d 764, 364 N.E.2d 622 (1977); *Figge v. Clark*, 174 N.W.2d 432 (Iowa 1970); *Steele v. Northrup*, 259 Iowa 443, 143 N.W.2d 302 (1966). *See generally* 1A A. Corbin, *Contracts* § 264 (1950); 1 S. Williston, *Contracts* § 61D (1957); *Annotation*, 71 A.L.R.3d 1201, at §§ 8, 10 (1976).

Questions may arise as to whether or not some of defendants' rights under the resulting contract were conditioned upon additional performance, tender, or mere notice of intent to perform, and whether failure to tender any required performance was excused for any reason.[11] However, resolution of these questions may contribute little to the outcome of this case beyond telling us whether, at the time of the merger, the contract was unilateral or bilateral. It appears that Coleman attempted to put such issues before the district court, since his affidavit went to the question of whether defendants had tendered performance of the valuation process under paragraph 11. It is clear from the record, however, that Coleman tendered no performance either. What is not clear is whether tender by either party was necessary, or whether failure of any required tender was excused. But at this stage the record does not go so far as to prove that the basic purchase and sale obligations under the contract were themselves rescinded or released.[12] It is true that the process of carrying out the paragraph 11 buy-back broke down. But this is easily understandable. The process

required cooperation between hostile camps. Failure of two parties to cooperate cannot be unexpected when they are prematurely and acrimoniously terminating their business relationship. But we can hardly infer from this failure that the parties wanted, contrary to their earlier intent, to remain as fellow shareholders in the same closely held business. No matter what relief Coleman receives, if any, for his alleged wrongful employment termination, he will be unable to have the court force defendants to rehire him. Thus, to infer rescission of the contract to buy Coleman's shares would be to infer an intent to *lock in* Coleman as a shareholder at the same time that he was being *locked out* as an employee.

Thus the core message of *Singer* and *Roland*—that the minority cannot be forced to defend its entire interest in corporate participation by a mere appraisal of its stock's monetary value—may well be irrelevant to this case. The district court held that "[w]hile Coleman may have agreed to a cash-out in accordance with the procedure outlined in paragraph 11, he in no way can be considered to have yielded his right to object to a merger that allegedly constituted a breach of fiduciary obligations owed to him." 487 F.Supp. at 121. We can agree with this statement insofar as it affirms the availability of relief for breach of any duty that *survives* in light of defendants' expressed intention to buy out Coleman under paragraph 11. However, having considered the scope of defendants' fiduciary duty under Delaware law, we conclude that paragraph 11 altered the fiduciary duty in such a way that a freeze-out merger under the circumstances may not have been a breach of defendants' duty. Coleman may not have possessed the type of interest protected in *Singer*, and Coleman is not in danger of being relegated solely to the appraisal

11. *Compare First Nat'l Bank & Trust Co. v. The Seneca*, 179 F.Supp. 847 (E.D.La.1960) (holding that the executory contract of sale, created upon notice of intent to exercise an option, did not, prior to its execution, cause title to pass to the purchasers) *with St. Louis Shipbuilding & Steel Co. v. First Nat'l Bank & Trust Co.*, 287 F.2d 366, 370 (5th Cir. 1961), *aff'g* 179 F.Supp. 847, *supra* (holding that the title did not pass to the purchaser because the

option was not "exercised" by the notice of intent).

12. The district court found in the merger a breach of paragraph 11. We do not understand Coleman to be asserting, at this preliminary stage in the lawsuit, a waiver of his right to any relief for this breach by acquiescing in a rescission.

proceeding which, in *Singer*, would have constituted the sole alternative to a cause of action for breach of fiduciary duty.

True, defendants seem to assume that a judgment in their favor, on this appeal, effectively relegates Coleman to a statutory appraisal under section 262 for valuation of his stock. We need not rely on *Singer* to reject the proposition that Coleman ought to assert his interest in vindicating the alleged wrong done to the corporation by Aaron Taub and his wife in a section 262 proceeding.[13] The defendants contend that Coleman failed to show that the right to a statutory appraisal extended to him under Del.Code tit. 8, § 262 differs in any material respect from the method of appraisal provided in the buy-back contract. However, defendants' argument is misguided. Valuation of Coleman's shares is closely linked to other factual and legal questions that Coleman will be obliged to litigate in his federal court suit. The district court will be free, on remand, to proceed with the contract issues that are brought before it. It is perfectly conceivable that the district court's disposition of these issues will eliminate the need for any proceedings under section 262. Moreover, because we only have before us the judgment in favor of Coleman on Count X (the claim for rescission of the merger), we do not reach the question of whether Count V (the derivative count) is mooted by the merger. The motion to dismiss Count V still remains for consideration by the district court on remand, together with its further consideration of the merits of Count X and the other contract-bound issues before it.

## IV.

The question of whether or not Coleman is entitled to relief on Count X turns, *inter alia*, on the question of the extent to which Coleman has bargained away his right to future participation in the corporate enterprise carried on by Old Taub. This issue, in turn, is intertwined with all of the other contract issues as yet unresolved in this case. We therefore believe that both Coleman's and defendants' motions for summary judgment on Count X were premature.

Accordingly, the district court's grant of summary judgment will be reversed and the case remanded for proceedings not inconsistent with this opinion.

---

**13.** Commentators have suggested that the protection afforded by *Singer* is appropriate where "going private" is part of a pattern designed to allow insiders to take advantage of market swings "first sucking in the public's money, and then squeezing out the public's participation." Brudney & Chirelstein, *A Restatement of Corporate Freezeouts*, 87 Yale L.J. at 1366; see Note, *Going Private*, 84 Yale L.J. 903, 931

(1975). The statutory appraisal proceeding will be inadequate to protect the minority in this respect insofar as the appraisal reflects the value of the corporation in a depressed market. There might be a similar inadequacy of the § 262 proceeding if it were to be used as the forum in which Coleman was required to raise the factual allegations now contained in his derivative claim.