[Civ. No. 2639.   Fourth Dist.—April 28, 1941.]

GEORGE A. RICHARDS et al., Appellants, v. PACIFIC SOUTHWEST DISCOUNT CORPORATION (a Corporation), Respondent.

Flint & Mackay, Wesley L. Nutten, Jr., and Maurice G. Covington for Appellants.

Elmer P. Bromley and H. E. Lindersmith for Respondent.

CONWAY, J., *pro tem.*—This is an appeal by plaintiffs and appellants from a judgment in favor of the defendant Pacific Southwest Discount Corporation, respondent herein.

The complaint alleged breach of contract and prayed for judgment in the sum of $5,057.59, with interest. Plaintiffs also set up a cause of action for declaratory relief which the court denied for the obvious reason that its findings to the effect that plaintiffs were not entitled to recover on the main cause of action for breach of contract necessarily precluded a finding on the count for declaratory relief. We shall set forth substantially the covenants and conditions of the contract essential to a proper determination of the questions involved herein.

On July 23, 1936, George A. Richards, as purchaser, and the Beverly Hills Broadcasting Corporation, as seller, entered into a written contract for the purchase and sale of all the capital stock of said corporation for the sum of $125,000. Respondent Pacific Southwest Discount Corporation owned all of the capital stock of the appellant corporation and on August 5, 1936, ratified and confirmed in writing the contract of purchase and sale and agreed to be bound by all of the terms, covenants and conditions thereof and, for the purposes of this appeal, we may consider the appellant George A. Rich-

ards as the buyer and respondent as the seller under the contract, each subject to the obligations and entitled to the benefits therein provided. The parties agreed to file an application with the Federal Communications Commission for the transfer of the ownership and control of the broadcasting station to the buyer, and agreed that "the consummation of this contract" is dependent upon such approval of the commission, which was given on June 8, 1937. The transaction was escrowed. It was agreed that there would be no cash withdrawals from the corporation except *dividends,* other than in the ordinary course of business of the corporation, and that no changes should occur in the financial conditions or essential operating properties of the corporation between the date of the contract and the date of closing the escrow, the latter date being admittedly June 8, 1937, except such changes as might occur in the ordinary course of business. It was expressly agreed that the earnings of the broadcasting station between the date of the signing of the contract and the date of the closing of the escrow belonged to the seller, and the respondent agreed to deliver to the buyer "assets and liabilities reflecting net worth not *less* than shown in the balance sheet, Exhibit A, as of June 30, 1936". Further, it was agreed that no changes should be made in the capital structure of the corporation. The foregoing statement substantially sets forth the pertinent parts of the contract requisite to a proper determination of the legal points involved. In the consideration of this appeal it should be noted that no question of fraud, bad faith or kindred matters are involved, and the sole questions presented concern the legal construction of the contract.

Ten thousand dollars was deposited in the escrow upon the date of the signing of the contract and the balance of the purchase price, $115,000, was paid and respondent claims it delivered to appellant the stock and assets of the corporation of a value corresponding to the net worth of the amount of the sum paid as set forth in the balance sheet of the corporation as of June 30, 1936. The trial court found that the respondent has fully performed its contract and satisfied the requirements thereunder.

It is stipulated that the earnings of the Beverly Hills Broadcasting Company from July 1, 1936, to July 23, 1936, both dates inclusive, amounted to $1270.82, and that this sum was retained by the seller, respondent herein, and dis-

tributed as dividends to its stockholders. The ownership of these earnings is the first question before us for decision, and that issue necessarily depends upon a judicial construction of the contract, especially where counsel for both parties contend that the contract is clear and unambiguous on its face, although each argues to opposite conclusions. The instrument itself is silent on the ownership of the earnings during this period. Appellant takes the position that the contract resulted in the present sale of the assets and properties of the corporation and, under such a construction, the earnings for this 23-day period belong to the buyer as earnings. He claims that section 15 of the contract, which provides that earnings of the corporation between the date of the contract, July 23, 1936, and the admitted date of the closing of the escrow, June 8, 1937, are the property of the seller to be distributed as dividends by the seller to its stockholders, shows by inference that it was the intention of the parties that the earnings between July 1st and July 23d should belong to the appellant. In this connection he construes the contract to provide for a present sale of the assets subject only to the approval of the Federal Communications Commission.

Respondent urges that paragraph 15 of the contract is inconsistent with such a theory and that a proper construction of the contract compels the conclusion that the stock and all its earnings remain in the seller until the Federal Communications Commission approves the transaction and the escrow is closed. In other words, the approval of the Federal Communications Commission was a condition precedent to the actual consummation of the contract. ■ It is, of course, clear that in the absence of an agreement to the contrary, the owner and holder of the legal title to the stock of a corporation is entitled to its earnings. Under an executory contract for the sale of stock of a corporation the buyer is not entitled to the dividends thereon until the legal title actually passes, in the absence of an agreement to the contrary. (*Gilfallan* v. *Gilfallan,* 168 Cal. 23 [141 Pac. 623, Ann. Cas. 1915D, 784].) ■ It must be presumed that the contracting parties dealt with each other with knowledge of the law relative to the sale of radio broadcasting stations. The Communications Act of 1934 (Title 47, sec. 310, U. S. C. A.), provides that no license or any rights granted therein shall be

transferred, assigned, or in any manner disposed of until the Federal Communications Commission shall first decide the transfer is in the public interest, and until said commission shall give its consent in writing to the change. This express provision in the contract for the subsequent approval of the Federal Communications Commission strongly indicates the executory nature of the transaction. The contract provides for the filing of an application for the ownership and control of the broadcasting station with the Federal Communications Commission, and obligates both contracting parties to execute and file all necessary documents in accordance with the contemplated transfer if and when made. It further provides that in the event no action was taken by the commission prior to July 1, 1937, either party may declare the contract ended and the parties returned to *status quo*. Subdivision (e) of the contract particularly states that the ''consummation'' of the contract depends upon the approval of the commission and in the event of disapproval by the commission that no further obligations exist upon either party, and the contract is clear to the effect that in the event of non-approval by the commission that all rights and obligations under the written instrument were terminated without damage to anyone.

We are in accord with the construction placed upon the contract by the trial judge that the contract is executory in character, that the title to the stock remained in the seller who was entitled to dividends declared pending the escrow, and that the buyer was not entitled to any part of the earning of the stock from July 1 to July 23, 1936. The fact that the contract provides that the earnings of the corporation between the date of the contract and the closing of the escrow belong to the seller creates no implication that the earnings of the stock prior to that time belong to the purchaser.

The second point urged for reversal of the judgment involves the legal right of the corporation to reduce the percentage of depreciation on its assets in determining its earnings from July 1, 1936, to June 8, 1937, the date of the closing of the escrow. It is, of course, fundamental that certain reservations for depreciation must be established before the true earnings of any corporation may be ascertained. From July 1, 1932, until and including the date of the contract,

the percentage of depreciation used by the corporation was as follows: 16⅔ per cent on broadcasting building; 10 per cent on furniture and equipment; and 15 per cent on all other assets. This rate continued until August 1, 1936, when the percentage of depreciation was reduced by the directors of the broadcasting corporation as follows: 6⅔ per cent on broadcasting building and equipment; 4 per cent on furniture and fixtures; and 6 per cent on all other assets. It is admitted that the change in the percentage rate of depreciation above outlined increased the earnings of the corporation from July 1, 1936, to June 7, 1937, in the sum of $3,791.05, which amount was distributed by the seller to its stockholders as dividends.

Appellants claim that subsection (c) of paragraph 15 of the contract which provides "that there will have been no changes in the financial conditions or essential operating properties of the corporation as reflected by the balance sheet as of June 30, 1930" prohibits the seller from reducing the percentage rate of depreciation of the properties and that respondent breached the contract in this respect. Appellant does not question respondent's right to the earnings of the broadcasting station from the date of the signing of the contract up to and including June 7, 1937, but challenges respondent's right to increase these earnings by a reduction in the rate of depreciation of its properties. No charge of fraud or deceit is made against the directors of the corporation in this respect and the sole issue is whether there was sufficient evidence presented at the trial from which the court could reasonably draw the inference that respondent was entitled, under the circumstances presented, and in the ordinary course of business, to reduce the rate of depreciation, for, in such case, it is apparent that there would have been no breach of contract.

Respondent maintains that appellants had no concern with the rate of depreciation charged by the board of directors of the seller corporation prior to the transfer of the stock and before appellants became the legal owners thereof. Respondent argues that under the terms of the contract it was only required to deliver corporate stock representing a radio broadcasting station possessing assets and essential operating properties of not *less* than the value of those assets set forth in the balance sheet as of June 30, 1936, and when the

corporation actually delivered the capital stock and assets equivalent to those contained in the balance sheet, it fully performed its contract. The evidence shows without contradiction that after appellant obtained control of the properties he continued to use the same rate of depreciation set by respondent on August 1, 1936, and in fact appellants' federal income tax returns for 1937 show that he used a lower rate than that established by respondent, of which he here complains. We feel this was a convincing circumstance which the court undoubtedly considered in showing the good faith of the directors of the respondent corporation in making the reduction.

■ Where there is no proof that the power of the board of directors of a corporation is limited or restrained, and in the absence of a showing of fraud or bad faith, the disposition of the surplus funds of the corporation rests in the sound discretion of the board of directors of the corporation. So long as they act honestly, their power over the disposition of such funds by way of dividends is absolute and the burden of proving bad faith was upon the appellants herein. (*Mulcahy* v. *Hibernia Sav. & Loan Society,* 144 Cal. 219 [77 Pac. 910].) ■ From a review of the transcript, we are satisfied that there was substantial evidence before the trial judge from which he was justified in drawing the inference that the directors of the corporation acted in good faith and in the ordinary course of business in reducing the rate of depreciation and in the declaration of the dividends complained of. The testimony of the witness Moore, a certified accountant, established that the general practice in the depreciation of assets required the directors to make a periodical survey of the amount that has been charged off over a period of years, and to compare the depreciated value to the expected remaining life of the asset, and to either increase or decrease the rate to be used from that time on; and to amortize the unamortized portion of the estate over the remaining life. This yard-stick was evidently accepted and adopted by the appellants' new board of directors who continued in effect the rate of depreciation theretofore set by the directors of the respondent corporation. We are unable to agree with appellants' contention that the contract incorporates the rate of depreciation in effect on the date of the contract. No rate of depreciation was mentioned in any respect in the

contract and it was silent upon the business and accounting practices to be used in the fixation of earnings and surplus available for dividends. The contract expressly provides that respondent may make such changes in the financial conditions and essential operating properties of the corporation as may occur in the ordinary course of business.

Appellant in his attack on the rate of depreciation fixed by the respondent corporation takes each item separately, consisting of the broadcasting building, equipment, antenna and towers, furniture and Neon signs, and compares that rate with the rate which he believes should have been fixed by the directors.

Considerable evidence was introduced by each party supporting their respective theories as to the actual rate of depreciation which should have been charged off by the board of directors on August 8, 1936, but it would needlessly prolong this opinion to review it here. For instance, appellants have misconstrued the facts with reference to the depreciation of the building when they argue that by use of 15 per cent per annum depreciation, the value of the building on September 30, 1937, would be practically zero. They are unwarranted in this conclusion for the reason that in this particular case the ground lease specifically recites that the building and improvements situated upon the property remained personal property and were owned by the lessee and are not a part of the lessor's estate. Also, appellants have endeavored to show that as much of the broadcasting equipment was junked, the larger rate of depreciation should have been used. There is conflicting evidence on this point and a review of the same shows that the broadcasting equipment was sufficient to earn a very substantial profit and that the changes made by appellant were prompted by a desire to fashion the new studio to his own tastes. Undoubtedly, in the ordinary course of the operation of a broadcasting station, more and new streamlined equipment is produced and it is undoubtedly the natural desire of every station to keep abreast of the times by a revamping of the rapidly changing equipment. This, however, does not indicate that the equipment discarded had not a value as set forth in the financial statement as of June 30, 1936.

A review of the evidence introduced by both sides convinces us that the most that can be said of the action of the board

of directors in depreciating the properties complained of is either supported or condemned in accordance with the divergent viewpoints of different public accountants as to what constitutes good accounting practices. Appellant has not charged nor proven, and the court has not found that any fraud or deceit or bad faith of any character has existed, and we are satisfied that the court was justified in drawing the conclusion that respondent had substantially performed its contract and had delivered properties and equipment, including contracts and other matters, in accordance with the terms of the financial statement as of June 30, 1936. The construction of this contract, which contained no ambiguities, was peculiarly within the province of the trial court. (*Western Industries Co.* v. *Mason Malt Whiskey Distilling Co.*, 56 Cal. App. 355 [205 Pac. 466].)

The sole purpose of every rule of interpretation is to ascertain the intention of the parties. (Civ. Code, sec. 1636; *McPherson* v. *Great Western Milling Co.*, 44 Cal. App. 491 [186 Pac. 803].) Where the terms of a contract are clear and certain, its meaning and effect and the relation of the parties to it thereby become a question of law to be decided by the trial court. (*Mickel* v. *Althouse*, 38 Cal. App. 321 [176 Pac. 51].) The initial power to construe a contract and determine its true meaning is in the trial judge. If we are satisfied that the construction which he has placed upon it is neither arbitrary nor unreasonable but is a fair interpretation of the language used, it will be accepted upon appeal. (*George Herz & Co.* v. *Solt*, 23 Cal. App. (2d) 178, at pp. 181, 182 [72 Pac. (2d) 251].) In accordance with this settled law, we are of the opinion that the construction of the trial court placed upon this contract was reasonable and that the judgment should be affirmed.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.