[No. S057635. Dec. 15, 1997.]

ALLEN W. STEPHENSON, Plaintiff and Appellant, v.
MAXWELL BRUCE DREVER et al., Defendants and Respondents.

1168

**COUNSEL**

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Denis T. Rice and Chong S. Park for Plaintiff and Appellant.

Morrison & Foerster, James J. Brosnahan, Jennifer H. Small, Barry R. Himmelstein and Mark W. Danis for Defendants and Respondents.

## OPINION

**MOSK, J.**—In this case a "buy-sell agreement" gives a closely held corporation the right and obligation to repurchase the shares of a minority shareholder-employee on termination of his employment, but is silent as to his shareholder rights during the postemployment period necessary to determine the value of his shares pursuant to the agreement. The narrow issue before us is whether the agreement nevertheless implies on its face an intention by the parties to deny the minority shareholder those rights during that period. As will appear, we conclude that it does not, and therefore reverse the judgment of the Court of Appeal affirming the judgment of dismissal in this action brought by the minority shareholder. Because the Court of Appeal did not reach an alternate ground on which the judgment was challenged, we will direct the court to address that ground.

### FACTS[1]

Plaintiff Allen W. Stephenson was employed by Drever Partners, Inc. (hereafter Drever Partners), a closely held corporation, in 1980, and became its chief financial officer in 1983. On December 15, 1990, a contract entitled "Stock Purchase Agreement" (hereafter the contract) was signed by Drever Partners, by its majority shareholder, Maxwell Bruce Drever (hereafter Drever), and by plaintiff. The contract recited that in recognition of the value of plaintiff's services and as an incentive for him to remain in its employ, Drever Partners agreed to sell plaintiff 500 shares of its common stock at par value. It provided that "In the event of the termination of Stephenson's employment for any reason whatsoever, including his retirement or death, then, on or before ninety (90) days after the date of such termination, Drever Partners shall have the right and obligation to repurchase all of the Shares" that it agreed to sell to plaintiff. It further provided that after September 15, 1991, the repurchase price of the shares would be "the fair market value thereof"; that if the parties could not agree on the fair market value, it would be fixed by an independent appraiser; and if the parties could not agree on the selection of such an appraiser, each party would appoint one appraiser and those two would appoint a third whose appraisal would be binding.

---

[1]Because this appeal is taken from a judgment of dismissal after the sustaining of a demurrer without leave to amend, we draw the operative facts, as did the Court of Appeal, from the complaint and from the record in an appeal (*Drever Partners, Inc. v. Stephenson* (Aug. 12, 1996) A071120, A071148 [nonpub. opn.]) in a related action between the same parties (Drever Partners, Inc. v. Stephenson (Super. Ct. S.F. County, 1995, No. 962810).) We may take judicial notice of the latter record. (Evid. Code, §§ 452, subd. (d)(1), 459.)

Drever Partners sold the 500 shares to plaintiff pursuant to the contract. The shares amounted to 11 percent of the outstanding common stock of the corporation; Drever owned the remaining 89 percent himself.

On May 16, 1994, Drever and plaintiff entered into an agreement (hereafter the 1994 agreement) providing that plaintiff's employment by Drever Partners would terminate as of July 1, 1994, and that for purposes of the stock repurchase provision of the contract plaintiff's shares would be valued as of May 1, 1994.[2]

The parties were unable to agree on the fair market value of plaintiff's shares, and a dispute over the appraisal process ensued. Because of that dispute the fair market value of plaintiff's shares has not yet been determined, Drever Partners has not yet repurchased those shares, and plaintiff remains their record owner.

On May 8, 1995, plaintiff filed the present action against Drever and two other persons (hereafter collectively defendants) in their capacities as officers and directors of Drever Partners. The complaint alleged that Drever controls Drever Partners by virtue of his position as chairman of its board of directors and his ownership of the 89 percent of its stock that plaintiff does not own. The complaint further alleged that since May 16, 1994, defendants caused Drever Partners to pay excessive compensation to Drever, used corporate assets of Drever Partners to satisfy personal judgments against Drever, and manipulated corporate accounts to falsely reflect a paydown of certain debts owed by Drever to the corporation; that the effect of the foregoing payments was to make undeclared distributions to Drever's majority shares without any corresponding distributions to plaintiff's minority shares; and that the purposes of such payments were to render Drever Partners unable to make distributions to plaintiff's minority shares, to undermine the fair market value of those shares, and to impair the corporation's power to repurchase those shares pursuant to the contract.

---

[2]Although the parties refer frequently to the 1994 agreement in their briefs, they have declined to allow us—or any court involved in this litigation—to see it. Their reason for this odd behavior may be inferred from a declaration that Drever filed in the related action cited above (fn. 1, *ante*); he there says that the 1994 agreement contains a "confidentiality provision" which, he explains in another pleading, prohibits its disclosure without prior written consent of the other party. Neither party, apparently, has consented to allow the courts to see the agreement. Instead, Drever asks the courts to take judicial notice of a declaration that plaintiff filed in the related action (in opposition to a motion for preliminary injunction) in which plaintiff either paraphrases or quotes—although for a wholly different purpose—selected provisions assertedly found in the 1994 agreement. This circuitous method of informing us of the facts of the case does not inspire confidence; the best evidence of a writing, of course, is the writing itself. (See Evid. Code, § 1500.) At oral argument counsel for Drever belatedly offered to move to augment the record on appeal to include the 1994 agreement. Because that agreement is not dispositive of any issue under the view we take of this case, we need not order such augmentation.

The complaint also alleged that Drever used his control of Drever Partners to deny plaintiff information on the financial condition of the corporation, to avoid holding the required annual shareholders' meeting, and to manipulate elections to the board of directors and reduce the size of the board so as to ensure that plaintiff did not become a director and thereby obtain the financial information he had been denied.

On the basis of these allegations the complaint charged that Drever breached the fiduciary duty that he owed as a director and as controlling shareholder to treat plaintiff, as the minority shareholder, fairly and in good faith and in a manner that benefits all shareholders proportionately. The complaint prayed for compensatory and punitive damages.

Defendants demurred on two principal grounds. First, they contended that they owed no fiduciary duty to plaintiff at any of the times alleged in the complaint because his status as a shareholder assertedly terminated as of May 1, 1994, the valuation date of the shares he had agreed to resell to Drever Partners upon leaving its employ.

Second, defendants contended the action was derivative in nature and (1) plaintiff lacked standing to sue derivatively because his shareholder status terminated on May 1, 1994, (2) even if plaintiff retained his shareholder status after that date he failed to allege the conditions precedent to a derivative action, and (3) plaintiff failed to join the corporation, which is an indispensable party in a derivative action, as a defendant.

The trial court sustained the demurrer on the first ground, without leave to amend. Relying on a group of out-of-state cases that we discuss below, the court ruled as a matter of law that on the face of the contract defendants' fiduciary duty to plaintiff by reason of his status as a shareholder ceased as of May 1, 1994, and after that date plaintiff's rights were contractual only and his relationship to Drever Partners was as a creditor, not as a shareholder.

The court also recited: "As a further reason to sustain the demurrer, the Court finds Defendants' arguments relating to the issue of derivative action quite persuasive." Like the Court of Appeal, we construe this recital as a formal ruling sustaining the demurrer on defendants' second ground as well.

The court then dismissed the complaint with prejudice.

The Court of Appeal affirmed the judgment of dismissal on the first ground of the demurrer, and for that reason declared it unnecessary to reach the second ground. We granted review.

■ The contract in issue is of the type commonly known as a buy-sell agreement.[3] A buy-sell agreement is a contract by which the stockholders of a closely held corporation (or a statutory "close corporation"; see Corp. Code, § 158) seek to maintain control over the ownership and management of their business by restricting the transfer of its shares. The typical buy-sell agreement provides for the mandatory or optional repurchase of a stockholder's shares by the corporation or by the other stockholders upon the occurrence of a certain event; the most common of the events that can trigger the repurchase are the stockholder's death or, if he is also an employee, his retirement or the voluntary or involuntary termination of his employment. (See generally, Business Buy-Sell Agreements (Cont.Ed.Bar 1997) ch. 3, p. 121 (hereafter Buy-Sell Agreements); 1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1997) § 63, p. 4-68 (hereafter Ballantine); Friedman, Cal. Practice Guide: Corporations 1 (The Rutter Group 1997) ¶ 3:187 et seq., p. 3-39 et seq.) The typical buy-sell agreement also specifies the method to be used to determine the repurchase price of the shares, selecting from such options as an agreed price with periodic revisions, a formula price based on book value or capitalization of earnings, or third party appraisal or arbitration. (Buy-Sell Agreements, *supra*, ch. 5, p. 269.) Although the agreement often serves multiple purposes, its principal objective is to permit the original owners of the corporation to retain control over the identity of their business associates; a secondary purpose is to protect the investment of the departing (or the estate of the departed) shareholder by facilitating the valuation and sale of an interest that might otherwise have no ready market. (1 Ballantine, *supra*, § 63.02, p. 4-69.)

Despite its specialized nature and purposes a buy-sell agreement remains a contract, and is therefore subject to the rules governing the validity, interpretation, and enforcement of contracts laid down by statute and case law. When we inquire what kind of contract a buy-sell agreement is, we see that in essence it is an executory contract to buy and sell personal property—specifically, shares of corporate stock owned by an employee—if and when a particular event occurs, i.e., the termination of his employment. ■ Plaintiff invokes the general rule that "Upon an executory agreement to buy and sell personal property, title does not pass to the buyer until delivery is made to him or is due to him and is offered to be made, unless there is something in the contract specifying or implying a different intention . . . ." (*Gilfallan* v. *Gilfallan* (1914) 168 Cal. 23, 31 [141 P. 623].) The cited case applied this rule to an executory contract for the sale of stock, concluding that until title thus passes the legal owner of the shares remains

---

[3]Such a contract is also known by such names as a buy-back agreement, a buy-out agreement, a stock repurchase agreement, a stock redemption agreement, or a first option agreement.

entitled to the dividends paid on the shares. (*Ibid.*; accord, *Richards* v. *Pacific S. W. Discount Corp.* (1941) 44 Cal.App.2d 551, 555 [112 P.2d 698].)

Defendants seek to distinguish *Gilfallan* v. *Gilfallan, supra,* 168 Cal. 23, and *Richards* v. *Pacific S. W. Discount Corp., supra,* 44 Cal.App.2d 551, on the ground they involved disputes between buyers and sellers of stock (*Gilfallan*) or of a corporation (*Richards*) over the rights to dividends, rather than a corporation's mandatory stock repurchase triggered by termination of the shareholder's employment; in the latter context, defendants argue, the question is not who has the rights to dividends but whether such rights exist at all. But this is a distinction without a difference: Even in the context of a corporation's repurchase of its stock from an employee, the question of when title passes from the employee to the corporation must still be answered, and that question is governed by the general rule of *Gilfallan.*[4]

Plaintiff has not delivered his shares to Drever Partners because their fair market value has not been determined and tendered to him. Under the foregoing general rule, therefore, legal title to plaintiff's shares has not passed to Drever Partners and plaintiff remains a shareholder of record of the corporation with all the rights appurtenant to that status, "unless there is something in the contract specifying or implying a different intention . . . ." (*Gilfallan* v. *Gilfallan, supra,* 168 Cal. at p. 31.) As the Court of Appeal correctly observed, "the parties have the power to agree that a shareholder loses his status as a shareholder upon some event other than actual transfer of shares to another." But the court went on to hold that in all mandatory repurchase agreements "the parties agree to end the shareholder's participation in the corporation upon the occurrence of the event triggering the right and obligation to repurchase," and hence that under the contract in the case at bar plaintiff lost his status as a shareholder immediately upon termination of his employment by Drever Partners. Plaintiff contends the contract before us does not so provide, either expressly or impliedly. The contention is meritorious.

First, the contract does not *expressly* provide that when plaintiff's employment terminates he immediately loses his status as a shareholder and is, in the Court of Appeal's words, "entitled to the value of his shares, but no longer . . . entitled to participation in the corporation." Defendants correctly

---

[4]Defendants also contended at oral argument that we deal here with an executed rather than an executory contract. We disagree. Although the contract is executed with respect to plaintiff's original purchase of his shares from Drever Partners, it remains executory with respect to Drever Partners' repurchase of those shares from plaintiff because the price of that repurchase has not yet been agreed upon or determined pursuant to the contract.

concede in their brief that the contract "is silent on the issue of shareholder rights during consummation of the repurchase . . . ."[5]

█ Defendants contend the contract nevertheless *implies* on its face an intention by the parties to cut off plaintiff's shareholder rights immediately upon termination of his employment. The contention is unpersuasive for several reasons.

First, the claimed implication is inconsistent with express provisions of the contract. To begin with, the contract is *not* silent on the legal consequence of the termination of plaintiff's employment: Rather than leaving that consequence to inference, the contract declares that in such event Drever Partners "shall have the right and obligation to repurchase all of the Shares" held by plaintiff. The fact that the contract expressly so provides tends to negate any inference that the parties also intended another consequence to flow from the same event. *Expressio unius est exclusio alterius.* (*Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 921 [16 Cal.Rptr.2d 226, 844 P.2d 545].)

More important, the same provision of the contract plainly contemplates some delay in consummating the repurchase of plaintiff's shares after the termination of his employment. Thus the contract first provides that the repurchase may take place at any time "on or before ninety (90) days after the date" of plaintiff's termination. Second, the contract provides that if the parties cannot agree on the fair market value of the shares, that value will be established not by the immediate application of a predetermined formula (e.g., book value) but by a *process*—i.e., appraisal—that involves several steps and hence will necessarily take time to complete. On this subject the contract provides that (1) the parties must find and appoint an appraiser agreeable to both; (2) that appraiser must make his own appraisal of the fair market value of the shares;[6] (3) if the parties cannot agree on an appraiser, each must appoint an appraiser of his own choosing; (4) the two appraisers

---

[5]To avoid misunderstanding we emphasize that although the contract is silent on this matter it could have expressly provided that plaintiff's rights and status as a shareholder terminate immediately upon termination of his employment. There is no statutory bar to such a provision. Compare the case of shareholders who compel the corporation to repurchase their shares at fair market value because they dissent to a proposed reorganization or merger. (Corp. Code, § 1300 et seq.) Although any cash dividends paid after the merger is approved but before the shares are paid for will be credited against their eventual repurchase price (*id.*, § 1307), "holders of dissenting shares continue to have all the rights and privileges incident to their shares, until the fair market value of their shares is agreed upon or determined." (*Id.*, § 1308.) A provision one way or the other on this question in a buy-sell agreement would advance the purposes of the agreement.

[6]Such an appraisal is itself a time-consuming process: "Before using any particular valuation method, an appraiser is required to make a study of the economics of the particular

thus appointed must find and appoint a third appraiser agreeable to both; and (5) the third appraiser must then make his own appraisal of the fair market value of the shares (see fn. 6, *ante*). The fact that the contract expressly provides for this process tends to negate any inference that the parties intended that the repurchase of the shares be consummated—and a fortiori that plaintiff's status as a shareholder be terminated—immediately upon plaintiff's termination as an employee.

Next, the claimed implication must be viewed in light of the statutory scheme in which the contract operates. This is not a case of a contract for the sale of ordinary commercial goods; in such a case recognition of an implied termination provision in the contract affects only rights created by the contract itself, i.e., rights of private origin. (E.g., *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 482-483 [289 P.2d 785, 49 A.L.R.2d 496] [contract to sell sugar beets; unstated price inferred from custom of trade].) Here the contract is for the sale of shares of corporate stock, and recognition of the implied termination provision urged by defendants would affect plaintiff's statutory rights as a shareholder under California law.[7]

A shareholder has a wide range of statutory rights to participate in corporate affairs. For example, annual shareholders' meetings must be held for the election of directors and the transaction of other corporate business, and each shareholder is entitled to attend in person or by proxy. (See § 600, subds. (a) and (b).) Any shareholder may obtain an order compelling the corporation to hold the annual meeting if it fails to do so, and the shares represented at that meeting ipso facto constitute a quorum. (*Id.*, subd. (c).)[8] A special meeting of the shareholders may be called at any time by the holders of 10 percent of the shares entitled to vote at the meeting. (§ 600, subd. (d).) At shareholders' meetings each shareholder is entitled to offer proposals to be voted on and to vote on proposals presented by management, and to nominate directors and to vote on the slate of directors nominated by management. Unless otherwise provided in the articles of incorporation, on each matter submitted to a vote every shareholder of record is entitled to cast

---

industry of which the company is a part, the company's competitive market position, the economic environment of the market served, the experience and capability of management and the assembled work force, the company's financial position and earnings record, and other pertinent factors." (Buy-Sell Agreements, *supra*, § 5.18, pp. 277-278.) Each of the most common valuation methods—i.e., asset valuation, earning power, or market comparisons (see *id.*, § 5.67, p. 324)—requires careful analysis of the data. And the ensuing report will ordinarily contain the appraiser's premises, methods, facts, reasoning, and conclusions. (*Id.*, § 5.69, p. 325.)

[7]All statutory references hereafter are to the Corporations Code unless otherwise specified.

[8]This quorum provision is "a powerful tool in forcing management to call the regular annual meeting." (Counseling Cal. Corporations (Cont.Ed.Bar 1990) § 3.22, p. 202.)

one vote for each share owned. (§ 700, subd. (a).) Upon notice given by any one shareholder, all shareholders are entitled to engage in cumulative voting for all nominated candidates for directors. (§ 708, subds. (a) and (b).) A shareholder has the right to vote by proxy (§ 705), or to join with other shareholders in a voting trust (§ 706, subd. (b)) or, in the case of a statutory "close corporation," in a voting agreement (*id.*, subd. (a)).

A shareholder also has valuable property rights. Foremost among these is the right to receive dividends. (See § 166.) When a dividend is lawfully declared by the board of directors it vests in the owner of record of the shares and creates a debt in his favor against the corporation. (*Smith* v. *Taecker* (1933) 133 Cal.App. 351, 352 [24 P.2d 182].) The shareholder's vested right to such dividend "cannot be defeated by later revocation of the dividend without his consent." (*Meyers* v. *El Tejon Oil & Refining Co.* (1946) 29 Cal.2d 184, 188 [174 P.2d 1].) In addition, unless otherwise provided in the articles of incorporation or in the stock certificate, a shareholder has the right to transfer or hypothecate his shares. (See § 204, subd. (b).) And only a shareholder, of course, has the right to bring derivative suits on behalf of the corporation. (§ 800.)

Finally, the foregoing rights are protected by a number of further rights to receive information concerning the corporation. Thus a shareholder has the right to written notice of any shareholders' meeting, stating its time and place and the business to be transacted (§ 601), and to be informed upon request of the results of any shareholders' vote taken at the meeting (§ 1509). A shareholder is entitled to receive an annual report or an equivalent financial statement. (§ 1501, subds. (a) and (c).) For any purpose reasonably related to his interests as a shareholder, a shareholder has the right to inspect and copy all shareholder lists and records (§ 1600, subd. (c)), the accounting books and records of the corporation and its subsidiaries (§ 1601, subd. (a)), and the minutes of meetings of the board of directors and its committees (*ibid.*). These statutory rights, moreover, cannot be limited by the articles or bylaws. (§§ 1600, subd. (d), 1601, subd. (b).)

Defendants do not contend the foregoing statutory provisions are inapplicable to closely held corporations. Yet the implied contractual provision urged by defendants would have the effect of stripping plaintiff of all these statutory shareholder's rights even though he remains the legal owner of record of shares representing 11 percent of Drever Partners' equity. A shareholder without a shareholder's rights is at best an anomaly, and at worst a shadowy figure in corporate limbo who would be voiceless in the conduct of the business of which he is part owner and largely defenseless against

neglect or overreaching by management. We will not interpret the contract to produce this result without a compelling reason to draw the inference proposed by defendants. Defendants fail to provide such a reason. We are not persuaded that their proposed inference is, as they urge, a "plain meaning" of the contract.

Plaintiff, moreover, is not just a shareholder of Drever Partners; he is its sole *minority* shareholder. For this reason defendants' claimed implication must also be viewed in light of the case law governing the relationship between directors and majority shareholders on the one hand and minority shareholders on the other. ■ "The rule of corporation law and of equity invoked is well settled and has been often applied. The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors." (*Southern Pac. Co.* v. *Bogert* (1919) 250 U.S. 483, 487-488 [39 S.Ct. 533, 535, 63 L.Ed. 1099].) We followed and expanded on this rule in the leading case of *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 [81 Cal.Rptr. 592, 460 P.2d 464] (*Jones*). There the majority shareholders in a corporation artificially created a market for their small number of high-value shares by forming a holding company, exchanging their shares for a large number of lower value shares of that company, and offering the latter for public sale; they excluded the minority shareholders from the scheme, however, making the stock of the latter effectively unmarketable.

We held that on these facts the minority shareholders could state a cause of action for breach of fiduciary duty against the majority shareholders. We rejected the earlier rule that majority shareholders owed no fiduciary duty to minority shareholders absent reliance on inside information. Instead, we declared that "Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business." (*Jones, supra,* 1 Cal.3d at p. 108.) We adopted "the comprehensive rule of good faith and inherent fairness to the minority in any transaction where control of the corporation is material" (*id.* at p. 112), and declared broadly that "[t]he rule applies alike to officers, directors, and controlling shareholders in the exercise of powers that are theirs by virtue of their position and to transactions wherein controlling shareholders seek to gain an advantage in the sale or transfer or use of their controlling block of shares." (*Id.* at p. 110.)

Again defendants do not contend the foregoing rule of fiduciary duty of majority shareholders is inapplicable to closely held corporations.[9] Yet the implied contractual provision urged by defendants would have the effect of relieving them of this fiduciary duty even though plaintiff remains the owner of the minority shares. During the period in which the parties are attempting to determine the fair market value of plaintiff's shares, the claimed implied provision would allow defendants to disregard this fiduciary duty and "use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority." (*Jones, supra,* 1 Cal.3d at p. 108.) As noted in our statement of facts, the complaint alleges instances of just such conduct by defendants. *Jones* forcefully affirmed "the strong public interest in assuring that corporate officers, directors, majority shareholders and others are faithful to their fiduciary obligations to minority shareholders." (*Steinberg* v. *Amplica, Inc.* (1986) 42 Cal.3d 1198, 1210 [233 Cal.Rptr. 249, 729 P.2d 683].) We will not interpret the contract to defeat that strong public interest without a compelling reason to draw the inference urged by defendants. Once more, they fail to provide such a reason.

Nor do defendants cite any California authority for their proposed inference. Instead, like the Court of Appeal, they rely heavily on cases from other jurisdictions. On close examination, however, the cited cases do not support defendants' position; indeed, their principal authority tends rather to support plaintiff.

Defendants place their primary reliance on *Coleman* v. *Taub* (3d Cir. 1981) 638 F.2d 628 (*Coleman*). To understand why *Coleman* is not in point it is necessary to review the decision in some detail. Coleman was an employee and the owner of 1 percent of the shares of Taub Builders, Inc. (Old Taub), a closely held corporation; the other 99 percent were owned by its president, Aaron Taub. Coleman's employment contract provided that upon termination of his employment for any reason Old Taub had the right to repurchase his shares within ninety days at a price to be agreed on, and that if the parties were unable to agree, the value of the shares would be determined by a panel of three appraisers, one selected by each party and the third selected by the first two. When Old Taub terminated him and gave notice of its intent to repurchase his shares, Coleman resisted and filed a diversity action in the Delaware federal district court on multiple counts, including one count charging wrongful termination and another alleging a shareholder's derivative claim for a loss in stock value. Aaron Taub responded by causing Old Taub to merge, without Coleman's knowledge, into a newly created shell corporation (New Taub) that was wholly owned by

---

[9]*Jones* was itself a case involving a closely held corporation. (See 1 Cal.3d at p. 102 & fn. 3.)

Taub himself, thus eliminating Coleman as a shareholder. Coleman's shares in Old Taub were canceled and he was tendered the cash price he originally paid for them. Coleman rejected the tender, and added a count to his complaint seeking rescission of the merger on the ground that it had no valid business purpose and hence was merely an impermissible "freeze out" merger.

The district court found that the sole purpose of the merger was to eliminate Coleman as a minority shareholder. The court held that under Delaware law a merger for this purpose alone was a violation of the fiduciary duty of fairness and good faith owed by majority to minority shareholders. The court therefore entered summary judgment for Coleman on this count, rescinding the merger and ordering the reissuance of Coleman's shares. (*Coleman, supra*, 638 F.2d 628, 631.)

Although the summary judgment disposed of only a single count of the complaint, the circuit court accepted the ensuing interlocutory appeal. (*Coleman, supra*, 638 F.2d 628, 631, fn. 4.) The circuit court first reasoned that under Delaware law minority shareholders have an "additional interest" in their shares beyond their bare monetary value. (*Id.* at p. 634.) That interest is the right to remain shareholders until their elimination serves a bona fide corporate purpose. (*Id.* at p. 635.) Simply ridding the corporation of minority shareholders is not such a purpose. (*Ibid.*) And impairment of this "additional interest" by the majority shareholders is a violation of their fiduciary duty to the minority. (*Ibid.*)

Nevertheless the circuit court reached a different result from the district court, because it believed that "a minority shareholder may bargain away the 'additional interest' in corporate participation which might otherwise be the basis for a fiduciary duty on the part of the majority." (638 F.2d at p. 636.) The court concluded that the stock buy-back provision of Coleman's employment contract with Old Taub could have constituted such a "bargaining away": the provision "altered the fiduciary duty in such a way that a freeze-out merger under the circumstances *may not have been* a breach of defendants' duty." (*Id.* at p. 638, italics added.) Whether it was such a breach, however, was "intertwined with all of the other contract issues as yet unresolved in this case." (*Id.* at p. 639.) The court therefore reversed the summary judgment on the rescission count on the ground it was premature, remanding the case for further proceedings on all issues. (*Ibid.*)

Insofar as relevant here, accordingly, the most that *Coleman* stands for is the proposition that an employee-shareholder *may* bargain away his right to remain a shareholder after termination of his employment, and with it the

benefits of the fiduciary duty owed by majority to minority shareholders. But that proposition is not in question in this case; here the issue is whether the particular buy-sell agreement before us should be interpreted to imply an intention of the parties to terminate the plaintiff's status as a shareholder immediately upon the termination of his employment and before his shares are valued and their purchase price tendered. Coleman made no such claim, and the decision in his case is therefore not in point.

Unable to cite *Coleman* as direct precedent, defendants and the Court of Appeal instead seek support by repeatedly quoting a passage of the *Coleman* opinion in which the circuit court inferred from the terms of the buy-sell agreement before it that "Old Taub intended to avoid under all circumstances the risk of disruption from a dissident, disaffected ex-employee. On the other hand, Coleman bargained for the right to be a shareholder only while he remained an employee. He did not bargain for the privilege of being a dissident, litigious, outside minority stockholder and the obvious purpose of the buy-back clause was undoubtedly to avoid such a situation." (638 F.2d at p. 637.)

When read in context, the quotation does not help defendants. The court's statement that "Coleman bargained for the right to be a shareholder only while he remained an employee" (638 F.2d at p. 637) appears to mean that the buy-sell agreement did not give Coleman the right to remain a shareholder after the process of repurchasing his stock was triggered by the termination of his employment *and that process was completed* by the valuation of his shares and the tender of their price. This fact is demonstrated by a clarifying explanation in the very next paragraph of the *Coleman* opinion, which defendants fail to quote: "Unlike the typical minority shareholder, whose right of continued participation in the corporate enterprise continues until he either sells his stock or is merged out for a valid business purpose, Coleman will have no right to continue to hold Old Taub shares *beyond the time that a value is placed on those shares and the purchase price is tendered in accordance with the contract* between Coleman and Old Taub. Fulfillment of Coleman's ultimate obligation of relinquishment must be preceded, of course, by various actions on the part of each party," e.g., a mutual agreement on the price or the selection of appraisers, and tender of the price thus determined. (*Ibid.*, italics added, fn. omitted.) This is precisely plaintiff's position in the case at bar.

We need not lengthen this discussion by a similar detailed review of the other out-of-state cases relied on by defendants. They all follow *Coleman, supra*, 638 F.2d 628, and are distinguishable on the same grounds. (See *Houglet* v. *BARRA, Inc.* (U.S. Dist. Ct., N.D.Cal., 1992, No. CV-91-03245-EFL) affd. (9th Cir. 1993) 9 F.3d 1551; *Jenkins* v. *Haworth, Inc.* (W.D.Mich.

*Jenkins* v. *Haworth, Inc.* (W.D.Mich. 1983) 572 F.Supp. 591; *Gallagher* v. *Lambert* (1989) 74 N.Y.2d 562 [549 N.Y.S.2d 945, 549 N.E.2d 136]; *Ingle* v. *Glamore Motor Sales, Inc.* (1988) 140 A.D.2d 493 [528 N.Y.S.2d 602], affd. (1989) 73 N.Y.2d 183 [538 N.Y.S.2d 771, 535 N.E.2d 1311]; *Bevilacque* v. *Ford Motor Co.* (1986) 125 A.D.2d 516 [509 N.Y.S.2d 595].)

Defendants next contend that the rule adopted by the Court of Appeal is supported by "public policy considerations." The point is without merit.

First, defendants cite no authority for the proposition that "public policy considerations" can trump the rule of substantive law that a shareholder under an executory contract to sell his stock is entitled to the benefits of ownership until delivery is made or tendered to the buyer, "unless there is something in the contract specifying or implying a different intention . . . ." (*Gilfallan* v. *Gilfallan, supra,* 168 Cal. 23, 31.) As we have seen, defendants show no such "different intention" on the face of the contract before us.

Second, defendants present no compelling "public policy considerations" in any event. They stress the beneficent purposes of buy-sell agreements in general, but plaintiff does not deny the purposes of such agreements or their value. Defendants also refer to the agreement assertedly entered into by the parties on May 16, 1994; they characterize this agreement as a "settlement" and invoke the broad policy in favor of settlements, citing *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273, 277 [10 Cal.Rptr.2d 859, 834 P.2d 119]. But even if this document were before us and even if it amounted to a true "settlement" within the meaning of the cited policy, the rule we apply herein would not be inconsistent with that policy. On the contrary, the rule we apply supports that policy by giving corporations and their majority shareholders incentive to expedite the process of repurchasing the shares of former employees pursuant to such settlements.

That same incentive also counterbalances a policy proposed by the Court of Appeal, i.e., that to hold as we do "would encourage employee-shareholders to initiate frivolous litigation in order to delay the repurchase of their shares." It could equally well be argued that to hold as the Court of Appeal did would encourage corporations and their majority shareholders to delay consummating the repurchase of the shares of a former employee after terminating his employment, thereby extending the period during which the latter remains, as we have said, a shareholder without a shareholder's rights, voiceless in the conduct of the business and defenseless against neglect or overreaching by management. Indeed, during this same period management could impair or defeat even the former employee's basic contractual right to

be *paid* for his canceled shares, e.g., by making excess distributions to the majority shareholders.[10]

Finally, defendants contend that if plaintiff were allowed to claim, as an element of damages in this action, his proportionate share of distributions from corporate profits earned after his separation from employment, it would result in an impermissible "double recovery" because those earnings will also be included in the calculation of the fair market value of his shares under the buy-sell agreement. Defendants rely on the general rule that "the current market value of a business as a going concern includes the discounted present value of its estimated flow of future earnings." (*California Shoppers, Inc.* v. *Royal Globe Ins.* (1985) 175 Cal.App.3d 1, 61 [221 Cal.Rptr. 171].)

The contention is unpersuasive. The quoted rule is appropriate when the valuation is wholly prospective, in which case all the earnings accruing after the valuation date will be "future" earnings that can only be "estimated." But when, as in the case at bar, the valuation will be partly retrospective because it will refer back to an earlier valuation date (here, May 1, 1994), earnings that accrued in the interim will be actual earnings that will not need to be "estimated." To the extent that any such actual earnings are distributed to the shareholder (or, as here, recovered by the shareholder as damages) before the appraiser determines the fair market value of the shares, it is true that double recovery could result from a mechanical application of the foregoing general rule. But it is also true that the appraiser can avoid such double recovery by the simple expedient of crediting any actual distributions received against the fair market value otherwise determined. Plaintiff asserts that such a credit is standard appraisal practice in valuing shares under a buy-sell agreement, and defendants do not contend the contrary.[11]

We conclude that the trial court erred in sustaining the demurrer on the first ground, and hence the judgment of the Court of Appeal upholding that ruling should be reversed.

In the Court of Appeal plaintiff also challenged the second ground on which the trial court sustained the demurrer—i.e., that the action was

---

[10]A corporation's repurchase of its stock is deemed a distribution (§ 166), and a corporation is barred from making any distribution unless it can meet the retained earnings or net worth tests imposed by law (§ 500). If a corporation becomes unable to meet those tests for any reason, a buy-sell agreement to which it is a party ipso facto becomes unenforceable. (1 Ballantine, *supra*, § 63.03, p. 4-76.)

[11]Again it is instructive to compare the case of shareholders who compel the corporation to repurchase their shares at fair market value because they dissent to a proposed reorganization or merger. (§ 1300 et seq.) As noted above (fn. 5, *ante*), any dividends distributed to the dissenting shares after approval of the reorganization but before payment for the shares by the corporation "shall be credited against the total amount to be paid by the corporation therefor." (§ 1307.)

derivative in nature—and defendants likewise defended the ruling on that ground. The Court of Appeal did not resolve that contention, and we will now direct it to do so.[12]

The judgment of the Court of Appeal is reversed and that court is directed to resolve the issues relating to the second ground on which the trial court sustained the demurrer herein.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**BROWN, J.,** Dissenting.—Plaintiff Allen W. Stephenson was employed as the chief financial officer of Drever Partners, Inc. (hereafter Drever Partners), a closely held corporation. On December 15, 1990, plaintiff entered a buy-sell agreement with Drever Partners and Maxwell Bruce Drever (hereafter Drever), its majority shareholder. Under the terms of the agreement, plaintiff purchased 500 shares of the common stock of Drever Partners at par value. After the purchase was consummated, plaintiff owned 11 percent of the outstanding common stock of Drever Partners, and Drever owned the remaining 89 percent. The buy-sell agreement provided that "[i]n the event of the termination of Stephenson's employment for any reason whatsoever, including his retirement or death, then, on or before ninety (90) days after the date of such termination, Drever Partners shall have the right and obligation to repurchase all of the Shares." On May 16, 1994, plaintiff and Drever Partners entered a second agreement providing that plaintiff's employment would terminate effective July 1, 1994, and that his stock would be valued at its fair market value as of May 1, 1994, for purposes of the buy-sell agreement.

Purporting to construe these agreements, the majority concludes that plaintiff retains his shareholder's rights in Drever Partners, including the right to dividends, "during the postemployment period necessary to determine the value of his shares pursuant to the [buy-sell] agreement." (Maj. opn., *ante*, at p. 1170.) I cannot agree. In my view, plaintiff's shareholder's rights terminated as of the mutually agreed upon May 1, 1994, valuation date.

---

[12]If the Court of Appeal affirms the judgment of dismissal on the second ground of the demurrer, the case will be at an end; if it does not, the judgment will be reversed and the case will proceed. If the case reaches the trial stage, and if extrinsic evidence is introduced on the issue of the meaning of the contract with regard to plaintiff's shareholder rights during the repurchase process, nothing we say here is meant to limit the power of the trial court to determine the credibility and weight of that evidence and to interpret the contract in its light. (See *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)

In reaching a contrary conclusion, the majority relies on *Gilfallan* v. *Gilfallan* (1914) 168 Cal. 23 [141 P. 623]. (See maj. opn., *ante*, at p. 1174.) In *Gilfallan*, we observed that "[u]pon an executory agreement to buy and sell personal property, title does not pass to the buyer until delivery is made to him or is due to him and is offered to be made, *unless there is something in the contract specifying or implying a different intention . . . .*" (168 Cal. at p. 31, italics added.) Applying this general rule in the context of a stock purchase agreement, we held that "[t]he buyer would not be legally entitled to dividends upon the stock in the absence of any agreement to that effect, until the legal title to the stock had passed to him." (*Ibid.*)

While I agree that this case is governed by the principles set forth in *Gilfallan* v. *Gilfallan*, *supra*, 168 Cal. 23, I disagree with the majority's conclusion that there is nothing in the parties' agreements specifying or implying an intention to terminate plaintiff's shareholder's rights prior to the completion of the stock valuation process. The very purpose of a buy-sell agreement is "to avoid under all circumstances the risk of disruption from a dissident, disaffected ex-employee" (*Coleman* v. *Taub* (3d Cir. 1981) 638 F.2d 628, 637), precisely the disruption that is occurring in the present case. If there were any doubt on this point, the parties put it to rest when they executed their second agreement, which guarantees plaintiff the fair market value of his stock as of May 1, 1994, a date two months *prior to* his termination. The majority implicitly recognizes that plaintiff's shareholder's rights terminated as of this valuation date when it acknowledges that the appraiser must "credit[] any actual distributions received against the fair market value otherwise determined." (Maj. opn., *ante*, at p. 1183.) In other words, under the majority's implausible construction of the parties' agreements, plaintiff retains his shareholder's right to dividends only to have to give those dividends back as a credit during the valuation process.

The majority melodramatically asserts that terminating plaintiff's shareholder's rights "would have the effect of stripping plaintiff of all [of his] statutory shareholder's rights even though he remains the legal owner of record of shares representing 11 percent of Drever Partners' equity. A shareholder without a shareholder's rights is at best an anomaly, and at worst a shadowy figure in corporate limbo who would be voiceless in the conduct of the business of which he is part owner and largely defenseless against neglect or overreaching by management." (Maj. opn., *ante*, at pp. 1177-1178; see also *id.* at pp. 1179, 1182-1183.) That spectre need not haunt us here. The parties' second agreement *guarantees* plaintiff the fair market value of his stock as of a date certain—May 1, 1994. Since plaintiff has no risk tied to the company's fortunes, he should have no rights as a shareholder. To the extent plaintiff's concern is that Drever Partners may be

taking steps to impair its ability to complete the repurchase of his shares, plaintiff should have exercised his rights as a creditor of the corporation.[1] Instead, the majority offers its own version of YOUNG FRANKENSTEIN (1974)—a creditor with shareholder's rights.[2]

For these reasons, I would hold that plaintiff's shareholder's rights terminated as of the May 1, 1994, valuation date and, accordingly, would affirm the judgment of the Court of Appeal.

---

[1] Plaintiff failed to pursue his creditor's remedies in the trial court, and the Court of Appeal rejected his belated request for leave to amend his complaint. Plaintiff has not challenged this aspect of the Court of Appeal's decision.

[2] Fortunately, in the future, drafters of buy-sell agreements can avoid the consequences of the majority's holding by stating the obvious—that shareholder's rights terminate as soon as a buy-back is triggered. (See maj. opn., *ante*, at p. 1175, fn. 5.)

KFC
45

Enclosed are three Crack-and-Peel inserts for correction of errors in the bound volume reports of two opinions.

The first insert, for Stephenson v. Drever (1997) 16 Cal.4th 1167, at page 1186, appears immediately below. Please remove the insert from the peel-off backing and position it to cover the first paragraph on page 1186.

taking steps to impair its ability to complete the repurchase of his shares, plaintiff should have exercised his rights as a creditor of the corporation.[1] Instead, the majority offers its own version of Young Frankenstein—a creditor with shareholder's rights.[2]