Filed 6/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ROBERT CUNDALL, | B293952 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BP124639) |
| v. | |
| VANESSA MITCHELL-CLYDE, Individually and as Successor Trustee, etc. | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County. Maria E. Stratton and Michael C. Small, Judges. Affirmed.

Klapach & Klapach and Joseph S. Klapach for Plaintiff and Appellant.

Williams Law Firm, Richard D. Williams and Mina Hakakian for Defendant and Respondent.

_____

Robert Cundall, the beneficiary of a living trust established by John W. Martin on February 11, 2009 (the February Trust), appeals from an order finding that the trust was properly revoked and is therefore invalid. Martin revoked the February Trust just a few months after he signed it after he had a falling out with Cundall. He established a new trust in May 2009 (the May Trust) with a new beneficiary.[1]

In revoking the February Trust, Martin did not follow the revocation method specified in the trust document, which required a signature by Martin's attorney, Frances Diaz, on the revocation document. Rather, with the assistance of a new estate planning lawyer, Martin revoked the February Trust using the statutory revocation method established by Probate Code section 15401, subdivision (a)(2).[2] That method simply requires that the settlor of a trust sign a revocation and deliver it to the trustee (who, in this case, was Martin himself).

Cundall claims that the statutory revocation procedure was not available to Martin. First, Cundall asserts that section 15401 does not apply to the February Trust because section 15401 establishes only an alternative *method* for revoking a trust and cannot circumvent a trust provision specifying who has the

---

[1] Just prior to the scheduled oral argument, the parties informed the court that the matter had settled. Despite a settlement, we have the discretion to decide the merits of an appeal that raises an issue of continuing public interest that is likely to recur. (*People v. Eubanks* (1996) 14 Cal.4th 580, 584, fn. 2; *Bushell v. JP Morgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 919, fn. 1.) We exercise that discretion here.

[2] Subsequent undesignated statutory references are to the Probate Code.

*authority* to do so.  Cundall argues that, by requiring Diaz's signature on the revocation document, the February Trust delegated authority to her as a "trust protector" to approve any revocation.  Second, Cundall argues that, even if the statutory revocation method is theoretically available when a trust specifies who must approve a revocation, the February Trust falls within an exclusion for trusts that "explicitly" make the trust revocation procedure "the exclusive method of revocation." (§ 15401, subd. (a)(2).)

Cundall's arguments call upon us to interpret section 15401 and apply it to the February Trust.  In deciding this issue of law, our path is partially paved by the opinion of Division Six of this appellate district in *Masry v. Masry* (2008) 166 Cal.App.4th 738 (*Masry*).)  In that case, the court held that a trust revocation procedure is not exclusive unless the trust document explicitly says that it is.  We agree with this holding, which is consistent with both the language and the history of section 15401.  The February Trust did not state that its revocation procedure was exclusive, and the alternative revocation procedure under section 15401 was therefore available to Martin.

We also reject Cundall's argument that section 15401 applies only to the *method* of revoking a trust and not the persons who may do so.  The distinction between method and authority is artificial; a "method" can include the persons with authority to accomplish a task.  And section 15401 in fact addresses who may revoke a trust.

We therefore affirm the trial court's order.

## BACKGROUND

### 1. The February Trust[3]

Martin, Cundall, and Diaz were all neighbors in West Hollywood. Martin owned a residence. Cundall owned a residence and some rental units. Diaz is a lawyer.

Cundall and Martin met in the neighborhood in 2007 and became friends. About a year later, Cundall saw the inside of Martin's house for the first time when he and Diaz fed Martin's cats. It was cluttered and unsafe. Cundall and Martin agreed that Martin would move into one of Cundall's rental units while Cundall remodeled Martin's house.

Cundall proceeded with the remodel. The original estimate for the work was $81,000; it ended up costing $219,000.

While the remodel was underway, Martin engaged Diaz to take over managing his finances and to prepare an estate plan. Diaz prepared the February Trust, which Martin executed.

The February Trust named Martin as the trustee. Cundall was both the sole beneficiary and the successor trustee.

Section VIII of the February Trust addressed revocation and amendment. The section stated in full: "During the Grantor's lifetime, the Grantor may revoke at any time, and/or the Grantor may amend, this Agreement by delivering to the Trustee and the Successor Trustee an appropriate written revocation or amendment, signed by the Grantor and his attorney, Frances L. Diaz. The powers of amendment may be exercised by a duly appointed and acting attorney-in-fact for the

---

[3] The relevant facts are not disputed. We therefore only briefly summarize the factual background based on the trial court's statement of decision.

4

Grantor for the purpose of withdrawing and/or distributing assets from the Trust."

## 2. Revocation of the February Trust and Execution of the May Trust

Five months into the remodel, for reasons that were unclear at trial, Martin "decided that he wanted to regain control of his finances and his property."[4]

Martin rehired his former bookkeeper, Carole Oster, to handle his finances. Martin also obtained a referral for a new estate planning lawyer, Paul Kanin.

Martin met with Kanin in March 2009. Martin told Kanin that he thought Cundall and Diaz had stolen from him and instructed Kanin not to speak with Diaz. Kanin thought that Martin was lucid and rational and agreed to prepare a new estate plan for him.

Martin prepared new estate planning documents, including documents establishing the May Trust and a revocation of the February Trust. The May Trust designated as beneficiaries respondent Mitchell-Clyde (Clyde), a friend of Martin's since the 1950's, and another friend, Ronald Preissman.[5] Preissman was the successor trustee.

The revocation document stated in full that "[t]he undersigned, John W. Martin, as Grantor and Trustee, hereby

---

[4] As the trial court explained, "Whether he was upset at the escalating costs, whether his relationship with Cundall was strained, whether he did not like the remodel—it is unknown to the court. However, it is clear to the court that Martin was done with the status quo."

[5] Preissman was previously a party to this case but reached a settlement before trial.

5

revokes the John W. Martin Living Trust Dated February 11, 2009." The revocation was signed only by Martin.

Martin executed the documents, including the revocation, on May 12, 2009. Kanin forwarded copies of the executed documents to Martin that same day. He also told Martin that he would notify Diaz, Cundall, and Preissman of the new estate plan.

Prior to execution of the May Trust documents, Martin had informed Diaz that he had retained a new estate planning attorney. Diaz wrote letters and e-mails to Kanin and Preissman, seeking information about the new estate plan and stating her belief that Martin was not in his right mind. Diaz also spoke with Martin's longtime doctor, but the doctor told Diaz that he thought Martin was fine.

The relationship among Diaz, Cundall, and Martin continued to deteriorate after the May Trust documents were executed. Diaz and Cundall attempted to have Martin psychiatrically evaluated. Cundall retained an attorney and terminated Martin's tenancy in Cundall's rental unit.

Clyde helped Martin move back into his house in June 2009. Martin died on January 25, 2010.

3.    **Proceedings in the Trial Court**

In September 2010, Cundall filed a petition for instructions under section 17200. (*In re the John W. Martin Living Trust Dated February 11, 2009* (Super. Ct. L.A. County, 2018, No. BP124639).) The petition sought a determination that the February Trust was not validly revoked and that all the trust assets should therefore pass to him. Clyde and Preissman filed an objection.

6

Also in September 2010, Clyde and Preissman filed a separate petition, seeking a determination that the February Trust was properly revoked and that the May Trust was valid and enforceable. (*In re the John W. Martin Living Trust Dated May 12, 2009* (Super. Ct. L.A. County, 2018, No. BP124548).) The two petitions were tried together in a 23-day trial (which extended over two years due to various continuances for health and scheduling reasons). Diaz represented Cundall at the trial.

The trial court issued a final statement of decision on July 31, 2018, concerning both petitions.[6] With respect to the facts, the court found no evidence that Martin lacked capacity to execute the May Trust, and also found no evidence that Martin was subject to undue influence by either Cundall or Diaz in executing the February Trust. The court stated that the "inexplicable vehemence with which Cundall and Diaz reacted when they learned of the May Trust . . . was of concern to the court," but the court nevertheless concluded that the evidence was too thin to support an inference that Diaz and Cundall "were scheming to get Martin's estate all along."

The court also found that there was no basis to reform the February Trust to require Diaz's consent to revoke the trust. The trial court found that Diaz's testimony was not credible, and that her testimony was "the only evidence that Martin wanted to be able to revoke the trust only with her consent."

With respect to the legal effect of Martin's May 2009 revocation, the trial court found that the February Trust "did not provide an explicitly exclusive means of revocation." Citing

---

[6] Cundall appealed only from the ruling on his petition in case No. BP124639.

7

*Masry,* the court concluded that Martin's revocation was therefore valid under the statutory revocation method set forth in section 15401, subdivision (a)(2), because Martin executed the revocation and Kanin sent him copies of the trust documents. (See *Masry, supra,* 166 Cal.App.4th 738.)

## DISCUSSION

### 1.    Standard of Review

Cundall's arguments on appeal concern the interpretation of section 15401 and interpretation of the language of the February Trust.  Both are issues of law that we review independently.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [interpretation of a statute is an issue of law]; *Burch v. George* (1994) 7 Cal.4th 246, 254 [interpretation of a trust instrument presents a question of law unless interpretation turns on a conflict in the extrinsic evidence].)

Clyde argues that this court must defer to the trial court's factual findings concerning Martin's intent in establishing the revocation procedure in the February Trust.  That would be true if our analysis depended upon any factual issues.[7]  For example, Cundall argues that Martin's intent in requiring Diaz's signature to revoke the February Trust was to identify her as a "trust protector" who would prevent Martin from making "improvident changes" to his estate plan.  If the availability of the statutory revocation method under section 15401 depended upon whether Martin intended Diaz to be such a trust protector, we might be

---

[7] In that event, we would consider whether the trial court's findings are supported by substantial evidence, not whether the trial court abused its discretion as Clyde suggests.  (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746–747.)

8

called upon to consider the trial court's factual finding that Diaz did not testify reliably on that point. But it is not necessary to consider that factual question. As discussed below, Martin's intent in requiring Diaz's signature is irrelevant because the February Trust does not explicitly state that it establishes the exclusive method to revoke the trust.

**2. The Alternative Revocation Procedure in Section 15401 is Available Whenever a Trust Document Does Not Explicitly State That It Establishes an Exclusive Revocation Method**

Section 15401, subdivision (a) establishes two alternative "methods" through which a "trust that is revocable by the settlor or any other person may be revoked in whole or in part." First, a trust may be revoked "[b]y compliance with any method of revocation provided in the trust instrument." (§ 15401, subd. (a)(1).) Second, a trust may be revoked "[b]y a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation." (§ 15401, subd. (a)(2).) Section 15401 establishes only one exception to the availability of this alternative statutory revocation mechanism: "If the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph." (§ 15401, subd. (a)(2).)

The trial court found that Martin (who was both the settlor and the trustee of the February Trust) complied with the statutory revocation procedure by executing the May 2009 revocation of the February Trust and then receiving a copy of the executed revocation from his attorney, Kanin. Cundall does not

9

challenge this factual finding.  Thus, if the statutory revocation method under section 15401, subdivision (a)(2) was available to Martin, it was effective to revoke the February Trust.

Cundall argues that Martin could not use the statutory revocation method for two alternative reasons.  First, Cundall argues that the statutory method does not apply when a trust establishes that a particular person other than the settlor—a "trust protector"—must approve a revocation.  Second, Cundall claims that the February Trust falls within the exception for a trust that specifies an "exclusive" method of revocation.  We reject both arguments.

    **a.**    ***There is no exception to the statutory revocation procedure for trusts that designate persons who must approve revocation***

Cundall argues that the alternative revocation method in section 15401 does not apply to trusts that establish a "trust protector" because section 15401 is limited to the "method" of revoking a trust rather than the *authority* to revoke.  The argument requires us to interpret section 15401.

In interpreting a statute, our task is to " ' " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " ' " (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)  In doing so, we "begin by examining the statutory language, giving the words their usual and ordinary meaning." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)  We construe the statutory language in context and in light of the statute's purpose.  (*Apple,* at p. 135; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  If the language is not ambiguous, "we presume the lawmakers meant what they said, and the plain meaning of

10

the language governs." (*Day, supra,* 25 Cal.4th at p. 272.) However, if there is ambiguity, we may "resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*Ibid.*) We then " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Ibid.,* quoting *People v. Coronado* (1995) 12 Cal.4th 145, 151.)

Applying these principles to section 15401, it is clear that, unless a trust document contains an explicit statement that the trust's revocation method is exclusive, the statutory revocation method is available, regardless of whether the trust document requires that a particular person approve revocation.

First, the language of section 15401 is unambiguous. In introducing the two methods of revoking a trust, section 15401 states that a "trust that is revocable by the settlor or any other person may be revoked in whole or in part by *any of the following methods.*" (§ 15401, subd. (a), italics added.) The only exception is that the statutory revocation method is unavailable "[i]f the trust instrument explicitly makes the method of revocation provided in the trust instrument the *exclusive* method of revocation." (§ 15401, subd. (a)(2), italics added.)

Thus, section 15401 does not create an exception to the scope of the statutory revocation procedure for trusts that require a person other than the settlor to approve revocation (unless, of course, the trust instrument explicitly states that such approval is the exclusive means of revoking). Whether one draws a theoretical distinction between the "method" of revoking and the "authority" to revoke therefore does not matter. The method of

11

revocation that section 15401 describes is available unless a trust document explicitly establishes another exclusive method.

Second, the distinction that Cundall draws between a method for revocation and the authority to revoke is inconsistent with the ordinary meaning of "method." Merriam-Webster defines "method" broadly as "a procedure or process for attaining an object." (<merriam-webster.com/dictionary/method> [as of May 27, 2020], archived at <https://perma.cc/3MDW-R7LR>.)[8] A procedure or a process can include the persons with the authority or responsibility to perform particular tasks. For example, a "method" of alternative dispute resolution may identify how arbitrators will be chosen and what their authority will be.

Third, section 15401 *does* address the authority to revoke a trust. It identifies who may use the statutory revocation method by stating that a trust that is revocable "by the settlor or any other person" may be revoked by a writing signed "by the settlor or any other person holding the power of revocation." (§ 15401, subd. (a)(2).) It also limits the authority of an attorney in fact by stating that a trust "may not be modified or revoked by an attorney in fact under a power of attorney unless it is expressly permitted by the trust instrument." (§ 15401, subd. (c).)

Cundall acknowledges that section 15401, subdivision (a)(2) addresses the authority of a designated "other person" to revoke a trust, but argues that this language actually shows that the Legislature intended to separate the issue of the authority to

---

[8] Cundall cites a similarly broad definition of "method" in dictionary.com as "the procedure, technique, or way of doing something." (<https://www.dictionary.com/browse/method?s=t> [as of May 26, 2020], archived at <https://perma.cc/T9RR-RBNQ>.)

revoke from the method of revocation. Cundall claims the language means that "if the settlor grants a third party the power to revoke the trust, it is that third party (not the settlor) who must invoke the statute." Thus, according to Cundall, section 15401 is agnostic about who has the authority to revoke a trust. Under Cundall's view, section 15401 simply accepts whatever a trust dictates on that subject, and then gives the designated person or persons another means to revoke the trust in addition to whatever revocation method the trust specifies.

The argument is inconsistent with the plain language of the statute. Section 15401, subdivision (a)(2) states that a writing revoking a trust may be signed by the "settlor *or* any other person holding the power of revocation." (Italics added.) By using the disjunctive, the Legislature gave the right to revoke both to the settlor and to any "other person" to whom the settlor gave such a right (unless, again, the settlor stated explicitly that revocation by the other person is the exclusive method to revoke).

Cundall's argument is also inconsistent with the legislative history of the language that he cites. The relevant language was added in 2012 by Assembly Bill No. 1683 (2011–2012 Reg. Sess.), which was sponsored by the Trusts & Estates Section of the State Bar. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1683 (2011–2012 Reg. Sess.) as amended Mar. 13, 2012, p. 1 (Assem. Com. Analysis).) The bill was intended to clarify uncertainty in the law stemming from court decisions that limited the right of a surviving spouse to revoke a joint trust after the death of the first settlor, even when the trust instrument gave the surviving spouse the right to revoke. (*Id.* at p. 2; see *Estate of Powell* (2000) 83 Cal.App.4th 1434.) Nothing in the legislative history suggests that the language was intended to

13

limit a settlor's statutory right to revoke a trust absent an explicit statement to the contrary. Rather, the Assembly Committee on the Judiciary explained that the bill "provides that a revocable trust may be revoked by the settlor or any person holding the power of revocation if the revocation is delivered to the trustee during the lifetime of *either* the settlor or the person with the power of revocation." (Assem. Com. Analysis, *supra*, at p. 3.)

Fourth, retaining authority in the settlor to revoke a trust unless the settlor explicitly surrenders that authority is consistent with the current statutory scheme. As discussed further below, section 15401 changed prior law by requiring an explicit statement that a revocation method described in a trust document is exclusive rather than permitting an inference of exclusivity based upon a trust's detailed revocation procedures. The current rule protects "the clear intention of the settlor who attempts to revoke a revocable trust by the statutory method, in circumstances that do not involve undue influence or a lack of capacity." (Selected 1986 Trust and Probate Legislation (Sept. 1986) 18 Cal. Law Revision Com. Rep. (1986) p. 1271 (Commission Report).)

Under the prior rule, courts defended the primacy of trust provisions on the ground that permitting revocation under the statutory method "would not allow [a settlor] to protect himself from the consequences of his whim, caprice, momentary indecision, or of undue influence by other persons." (*Hibernia Bank v. Wells Fargo Bank* (1977) 66 Cal.App.3d 399, 404 (*Hibernia*); see also *Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956, 970 (*Huscher*) ["if the trustor has gone to the trouble to spell out a revocation method in some detail, the

14

procedure must have some importance to the trustor, *especially where the procedure is geared toward protecting the trustor from his own incompetence* or the undue influence of others," italics added].) This is precisely the argument that Cundall makes in support of the conclusion that the statutory revocation procedure in section 15401 should not apply to trust protector provisions.

Fifth, the interpretation of section 15401 that Cundall urges is not necessary to preserve the role of a "trust protector." A settlor who wishes to require that a trust protector approve any revocation need only state explicitly in the trust instrument that such approval is the exclusive method to revoke. That is a simple and reasonable requirement, and there is no reason to believe the Legislature intended any different interpretation of section 15401 simply because the use of a trust protector is a recognized estate management tool.

We therefore reject Cundall's argument that the statutory revocation method in section 15401, subdivision (a)(2) did not apply to the February Trust because the trust designated Diaz as a "trust protector."

### b. *The February Trust did not explicitly establish an exclusive method of revocation*

Cundall argues that even if section 15401 applies to the February Trust, the revocation procedure specified in the trust was exclusive. (§ 15401, subd. (a)(2).) Cundall argues that the trust's revocation procedure was explicitly exclusive because it expressly specified the conditions under which the trust could be revoked.

Cundall's argument is inconsistent with the plain language of the statute. Simply establishing a particular method of

15

revocation does not *explicitly* make that method exclusive. As the court explained in *Huscher,* the term " 'explicit' " "is equated with the term 'express,' and means directly and distinctly stated in plain language that is unequivocal and unambiguous." (*Huscher, supra,* 121 Cal.App.4th at p. 968, citing *Jones v. Regan* (1959) 169 Cal.App.2d 635, 640.) A statement does not explicitly communicate the author's intent if one must make an inference to understand that intent. (*Huscher,* at p. 968 ["explicit 'implies such verbal plainness and distinctness that there is no need for inference and no room for difficulty in understanding' "], quoting Webster's 9th New Collegiate Dict. (1988) p. 438.)

Absent a direct statement of exclusivity, to reach the conclusion that a settlor intended a specific revocation method to be exclusive one must infer that the settlor would not have established that revocation method if he or she intended another to apply.[9] Whether or not such an inference is reasonable in light of the particular trust provision, it is still an inference. The settlor's intent is not *explicit.*

The court in *Masry* interpreted section 15401 similarly. In *Masry,* the trustors, a husband and wife, established a family

---

[9] Cundall's argument recognizes this. Cundall relies on the principle of interpretation acknowledging that an author's choice to specify one thing tends to exclude others ("expressio unius est exclusion alterius"). (*Stephenson v. Drever* (1997) 16 Cal.4th 1167, 1175.) In *Stephenson*, our Supreme Court explained this principle in the context of contract interpretation: "The fact that the contract expressly so provides *tends to negate any inference* that the parties also intended another consequence to flow from the same event." (*Ibid.*, italics added.) Negating an inference about a drafter's intent is much different from an explicit statement about his or her intent.

trust.  They stated in the trust instrument that each reserved the power to revoke the trust during their joint lifetimes "by written direction delivered to the other Trustor and to the Trustee." (*Masry, supra,* 166 Cal.App.4th at p. 740.)  However, the trust instrument did not say that this method was exclusive.  (*Ibid.*) The husband executed a document revoking the trust but failed to deliver it to his wife during his lifetime.  (*Id.* at pp. 740–741.)

The court held that the husband nevertheless successfully revoked the trust under the statutory method.  The court cited *Huscher* for the principle that " 'a modification method is explicitly exclusive when the trust instrument directly and unambiguously states that the procedure is the exclusive one.' " (*Masry, supra,* 166 Cal.App.4th at p. 742, quoting *Huscher, supra,* 121 Cal.App.4th at p. 968.)  The court reasoned that, "[i]f the language in the trust were sufficient to qualify as the explicitly exclusive method, then the language in section 15401, subdivision (a)(2) would be unnecessary."  (*Masry,* at p. 742.) Although the court recognized that the discussion on this issue in *Huscher* was dictum, the court adopted the reasoning in that case in concluding that, "absent language in the trust that its method of revocation is exclusive, the trustor has the option of revoking according to the method provided in . . . section 15401, subdivision (a)(2), delivering notice to himself as trustee."  (*Id.* at p. 743.)

In *Huscher,* the court considered whether a trust was properly modified under the law that preceded section 15401.[10]

---

[10] Because the trust in *Huscher* was created before July 1, 1987, it was governed by the prior law.  (*Huscher, supra,* 121 Cal.App.4th at p. 961, citing section 15401, subd. (e).)

The trust at issue required that an amendment be signed by both the trustor and the trustee, but the trustor alone signed a number of instructions purporting to amend the trust. (*Huscher, supra,* 121 Cal.App.4th at pp. 959–960.) After the trustor's death, a beneficiary challenged the amendments. The trustee bank defended the validity of the amendments, arguing that the amendment procedure set forth in the trust instrument was not exclusive, and that the trustor's amendments complied with the procedure in former section 2280 of the Civil Code.[11]

After surveying the relevant cases, the court concluded that, under the prior case law, a trust could be revoked or amended by the statutory procedure unless the trust "contains a revocation or modification procedure that is *either explicitly or implicitly exclusive.*" (*Huscher, supra,* 121 Cal.App.4th at p. 970, italics added.) The court contrasted that rule with the rule under section 15401, which requires explicit exclusivity. (*Id.* at pp. 960, 967.) The court also noted that the requirement for explicit exclusivity represented a "change in the prior case law rule." (*Id.* at p. 971, fn. 13.)

---

[11] Prior to the enactment of sections 15401 and 15402 in 1986, both revocation and modification of trusts were governed by former section 2280 of the Civil Code. (*Huscher, supra,* 121 Cal.App.4th at pp. 961–963 & fn. 6; see *King v. Lynch* (2012) 204 Cal.App.4th 1186, 1191 (*King*).) At the time it was repealed, Civil Code section 2280 provided that "[u]nless expressly made irrevocable by the instrument creating the trust, every voluntary trust shall be revocable by the trustor by writing filed with the trustee." (*Huscher,* at p. 963.) The first part of this sentence was preserved in the current section 15400, which now reads in part: "Unless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor."

We agree with the holding in *Masry* and the dicta in *Huscher*. The interpretation of section 15401 in those cases gives effect to the plain meaning of the section and also recognizes the change that section 15401 made to the prior law.

Cundall argues that section 15401 did not actually change the prior rule that a trust instrument could impliedly establish an exclusive revocation method by creating a specific and detailed procedure for revocation. The argument is inconsistent both with the plain language of section 15401 and with the legislative history.

In a comment to section 15401 when it was reenacted in 1990, the California Law Review Commission (Commission) explained that, under that section, a "settlor may revoke a revocable trust in the manner provided in subdivision (a)(2), unless there is a contrary provision in the trust." (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2020 ed.) foll. § 15401.) The Commission expressly stated that "[t]his changes the rule under prior case law." (*Ibid.*)

Prior to the enactment of section 15401 in 1986, the Commission explained *how* the section changed prior law. In the Commission Report, the Commission summarized the prior law by stating that "California courts generally have held that where the trust instrument prescribes a method of revocation, the prescribed procedure must be followed rather than the statutory method." (Commission Report, *supra.* at p. 1270.) The Commission explained that a consideration in favor of that rule was that "the settlor may wish to establish a more complicated manner of revocation than that provided by statute where there is a concern about 'future senility or future undue influence while in a weakened condition.' " (*Id.* at p. 1271, quoting Cohan &

19

Kasner, Supplement to Drafting California Revocable lnter Vivos Trusts (Cal.Cont.Ed.Bar 1982) § 5.2, p. 73.) However, a contrary view was that enforcing the method of revocation specified in a trust instrument might defeat the intention of a settlor who is mentally competent and attempts to revoke using the statutory method, particularly where "the settlor may have forgotten about the method provided in the trust, or may not be aware of the case-law rule." (Commission Report, *supra*, at p. 1271.)

The Commission explained that the proposed legislation "adopts a compromise position that makes available the statutory method of revoking by delivery of a written instrument to the trustee during the settlor's lifetime except where the trust instrument explicitly makes exclusive the method of revocation specified in the trust. This allows a settlor to establish a more protective revocation scheme, but also honors the settlor's intention where the intent to make the scheme exclusive is not expressed in the trust instrument." (Commission Report, *supra,* at p. 1271; see also *King, supra,* 204 Cal.App.4th at p. 1192 [the Commission Report's characterization of section 15401 as a "compromise position" shows that, "with respect to revocation, the Legislature adopted the essence of the *Huscher* court's analysis"].) Thus, the "compromise position" embodied in section 15401 clearly changed the prior law.

Cundall's reliance on *Hibernia,* which was decided under the prior law, is therefore misplaced. (See *Hibernia, supra,* 66 Cal.App.3d at pp. 402–405.)

Cundall also cites *Conservatorship of Irvine* (1995) 40 Cal.App.4th 1334, which was decided under current law and contains language suggesting that section 15401 incorporated existing prior case law. (*Id.* at p. 1344, fn. 3.) We disagree with

20

this conclusion for the reasons discussed above.  Moreover, the issue in *Irvine* was not the validity of a trust revocation, but rather the validity of a purported trust *modification*, which under current law is subject to a different statutory analysis.  (See *King, supra,* 204 Cal.App.4th at p. 1193.)  Finally, as the courts in *Huscher* and *Masry* both noted, *Irvine* is unpersuasive in interpreting section 15401, as the court in that case relied on authorities that had interpreted Civil Code former section 2280.  (See *Huscher, supra,* 121 Cal.App.4th at p. 966; *Masry, supra,* 166 Cal.App.4th at p. 742.)

Finally, Cundall cites *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, where the court offered the observation that, if a trust provides a method of revocation, section 15401, subdivision (a)(2) is inapplicable.  (*Id.* at p. 894.)  The observation was dictum—the actual issue in that case was whether a trustor effectively revoked her trust under the method specified in the trust itself by executing a subsequent will.  (*Id.* at p. 888–895.)  The peripheral nature of the court's observation is apparent from the fact that the court also correctly stated in a prior footnote that section 15401, subdivision (a)(2) "provides a default method of revocation where the trust is silent on revocation *or does not explicitly provide the exclusive method.*"  (*Id.* at p. 894, fn. 7, italics added.)  We agree with the court in *Masry* that the dictum in *Gardenhire* on which Cundall relies was wrong.  (See *Masry, supra,* 166 Cal.App.4th at p. 743.)

The February Trust did not explicitly state that the method of revocation the trust established was exclusive.  The trial court therefore correctly concluded that Martin effectively revoked the February Trust under the statutory method by executing the

revocation document in May 2009 and receiving an executed copy of the revocation from Kanin.

## DISPOSITION

The trial court's order is affirmed. Clyde is entitled to her costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.